# EXHIBIT A

Page 1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK

2   ------------------------------------------X

3   ESTER LORUSSO,

4           Plaintiff,

5                           Case No.

6                           07CV3583 (LBS)(RLE)
        -against-

7   ALITALIA-LINEE AEREE ITALIANE SpA

8           Defendant.

9   ------------------------------------------X

10

11

12

13

14      Videotaped Deposition of Ester Lorusso

15              December 19, 2007

16              New York, New York

17

18

19

20

21

22

23  REPORTED BY:

24  Helen Mendlowich

25

Ester Lorusso                                                    12/19/2007

Page 30

LORUSSO

1
2    Q.   You just remember that he said it?
3    A.   Absolutely.
4    Q.   Do you remember the context in which he
5  said it?
6    A.   No.
7    Q.   Do you know if anybody else was present
8  when he said that?
9    A.   No.
10   Q.   Did he give you any examples of how he
11  felt Mr. Libutti couldn't deal with women in higher
12  positions?
13   A.   Yes.  Mr. Libutti wanted me out of the
14  office.
15   Q.   Mr. Gallo told you Mr. Libutti wanted you
16  out?
17   A.   I don't remember if he told me
18  specifically but he definitely alluded to it.
19   Q.   I'm not too clear.
20   A.   I'm not too clear on your question.  Let's
21  go back.
22   Q.   Let's go back.
23       Did he specifically tell you that Mr.
24  Libutti wanted you out?
25   A.   Yes, he did.  Yes.

Page 31

LORUSSO

1
2    Q.   And that was a few years ago that he said
3  that?
4    A.   Yes.
5    Q.   Can you recall what position you were in
6  at the time?
7    A.   Yes.
8    Q.   What position were you in at the time?
9    A.   I was the director of marketing.
10   Q.   Director of marketing for Alitalia,
11  Passenger Division?
12   A.   Yes.
13   Q.   Do you recall how long Mr. Libutti had
14  been in the New York office at the time Mr. Gallo
15  said this?
16   A.   Approximately a year.
17   Q.   Would you say this was said in the summer
18  of 2004?
19   A.   It was said sometime in 2004.
20   Q.   Did Mr. Libutti give any other examples --
21  pardon me.  Did Mr. Gallo give any other examples at
22  the time of --
23   A.   I don't recall.
24       MS. KURZON:  You have to let him finish.
25   A.   Sorry.

Page 32

LORUSSO

1
2    Q.   -- of women with whom Mr. Libutti couldn't
3  deal who were in high places?
4    A.   I don't recall.
5    Q.   You do recall that he said that Libutti
6  couldn't deal with women in high positions, for
7  example he wanted to get rid of you?
8    A.   Yes.
9    Q.   Did Mr. Libutti fire you in 2004?
10   A.   No.
11   Q.   Did Mr. Libutti fire you in 2005?
12   A.   No.
13   Q.   Did Mr. Libutti fire you in 2006?
14   A.   No.
15   Q.   Did Mr. Libutti fire you in 2007?
16   A.   He wasn't there.
17   Q.   So the answer is no.
18   A.   So the answer is no.
19   Q.   Yes.  Do you know of any women in high
20  positions who Mr. Libutti did fire?
21   A.   There were no other women in high
22  positions besides me.
23   Q.   Are you sure of that?
24   A.   In North America?
25   Q.   Yes.

Page 33

LORUSSO

1
2    A.   Yes.
3    Q.   What about Lucia Alia?
4    A.   She wasn't in a high position at that time
5  when Libutti was there.
6    Q.   She was not in a high position when Mr.
7  Libutti was there?
8    A.   No, she was not.
9    Q.   After Mr. Gallo told you sometime in 2004
10  that Mr. Libutti couldn't deal with women in high
11  positions, did he ever repeat that statement again?
12   A.   I don't recall.
13   Q.   You don't recall?
14   A.   I don't recall.
15   Q.   Did Mr. Gallo mention Mr. Libutti during
16  your coffee?
17   A.   By name?  I don't recall.
18   Q.   You said that Mr. Gallo did mention
19  Alitalia policies about women at the coffee?
20       MS. KURZON:  Objection.  I think she
21   actually said they didn't talk about policies.
22       MR. KORAL:  You are correct.  She did
23   testify to that.
24   Q.   You said that Mr. Gallo spoke about
25  Alitalia and women at your coffee?

One Penn Plaza, NYC
email@tobyfeldman.com                Toby Feldman, Inc.                tel (212) 244.3990
                      NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS   tel (800) 246.4950

Page 42

LORUSSO

1
2   MR. KORAL: When Mr. Gallo was talking
3   about leaders of the company openly and
4   privately expressing contempt for older
5   employees, females and homosexuals.
6   A.  It would be throughout the period that I
7   worked for the company.
8   Q.  Yes.  And who, specifically, do you
9   understand those leaders were during this period?
10  And I'm only interested in 2004 going forward.
11  A.  That would be Giulio Libutti.
12  Q.  Anybody from Rome that you understand is a
13  leader of the company who expressed openly or
14  privately contempt for older employees, females and
15  homosexuals?
16  A.  There are others, or there were others in
17  Rome.
18  Q.  But you don't know their names?
19  A.  At this time, no.  I don't recall.
20  Q.  Did you ever hear Giulio Libutti openly
21  express contempt for older employees?
22  A.  I don't recall.
23  Q.  Did you ever hear Guilio Libutti privately
24  express contempt for older employees?
25  A.  I don't recall.

Page 43

LORUSSO

1
2   Q.  Did you ever hear Guilio Libutti openly
3   express contempt for females?
4   A.  Yes.
5   Q.  How many times?
6   A.  I don't recall.
7   Q.  Can you recall any single instance?
8   A.  A single instance?  He referred to a
9   female marketing executive in Rome and he alluded to
10  the fact that she could get a higher position if she
11  would sleep with someone.
12  Q.  Who was that female employee?
13  A.  Silvia Del Sole.
14  Q.  Silvia --
15  A.  -- Del Sole.
16  Q.  You said that statement was made publicly?
17  A.  That statement was made before me and one
18  of my colleagues.
19  Q.  Who was the colleague?
20  A.  Gabriele Mariotti.
21  Q.  Did you ever tell Silvia Del Sole that Mr.
22  Libutti had said that?
23  A.  No.
24  Q.  Did you ever tell anybody else that Mr.
25  Libutti had said that, apart from your attorneys?

Page 44

LORUSSO

1
2   A.  No.
3   Q.  Did you make any objection to Mr. Libutti
4   at the time he did say that?
5   A.  No.
6   Q.  Did Mr. Mariotti make any objection to Mr.
7   Libutti at the time Mr. Libutti said that?
8   A.  I don't believe so.
9   Q.  Any other instances that you regard as
10  public expressions of contempt for women, for
11  females?
12  A.  I don't recall.
13  Q.  You can't recall anything else?
14  A.  No.
15  Q.  Can you recall approximately when Mr.
16  Libutti made that statement about Silvia Del Sole?
17  A.  That must have been in 2004.
18  Q.  Why do you say must have been?
19  A.  Because I was still reporting to him at
20  the time.
21  Q.  After you went into GA2000 you did not
22  report to Mr. Libutti; is that right?
23  A.  No.  I still did, actually.
24  Q.  But you are pretty sure this was before
25  you were in GA2000?

Page 45

LORUSSO

1
2   A.  Yes.
3   Q.  Can you recall any instances where Mr.
4   Libutti privately expressed contempt for females?
5   A.  I can't recall.
6   Q.  Can you recall any occasions where Mr.
7   Libutti publicly expressed contempt for homosexuals?
8   A.  No.
9   Q.  Can you recall any occasions where Mr.
10  Libutti privately expressed contempt for
11  homosexuals?
12  A.  No.
13  Q.  Now, the statement here is that Mr. Gallo
14  can describe an environment in which leaders of the
15  company openly and privately expressed contempt for
16  older employee, females and homosexuals.
17  Can you recall any instances that Mr.
18  Gallo told you about in which he heard leaders of
19  the company openly express contempt for older
20  employees?
21  A.  I cannot recall the specific instances.
22  Q.  Okay.  Can you recall any instance where
23  he told you about leaders of the company privately
24  expressing contempt for older employees?
25  A.  No, not specific instances.

12 (Pages 42 to 45)

Ester Lorusso                                    12/19/2007

Page 46

LORUSSO
1
2      Q.   Maybe to save time, is that true as well
3   for contempt for females and homosexuals, that you
4   can't recall any specific instances that Mr. Gallo
5   gave you?
6      A.   No.  They were just general statements
7   that he would make, but I don't remember the
8   specific instances.
9      Q.   Do you believe he made those statements
10  more than once to you?
11     A.   Yes.
12     Q.   Did he ever put a statement like this in
13  writing that you have seen?
14     A.   No.
15     Q.   Did Mr. Gallo indicate to you that he had
16  ever protested anything that he regarded as
17  expressions by leaders of the company of contempt
18  for older employees, females or homosexuals?
19     A.   Yes.
20     Q.   What do you recall him telling you about
21  his protesting?
22     A.   Specifically to discriminating against me
23  at the time it was happening.  I believe he told
24  Libutti that it was unlawful to discriminate against
25  female employees in the United States.

Page 47

LORUSSO
1
2      Q.   When did Mr. Gallo tell you that he told
3   Libutti that it was unlawful to discriminate against
4   female employees in the United States in connection
5   with your situation?
6      A.   I don't remember.
7      Q.   Can you recall what position you were in
8   at the time that Mr. Gallo says that he said this to
9   Libutti?
10     A.   No.
11     Q.   Can you recall what the details of the
12  discrimination were that Mr. Gallo was supposedly
13  protesting to Libutti?
14     A.   Yes.  That my job was being given to a
15  male employee.
16     Q.   And is that male employee Tim O'Neill?
17     A.   Yes.
18     Q.   Tim O'Neill had been the head of Italia
19  Tours?
20     A.   Yes, years back.
21     Q.   And then Tim O'Neill came back to Alitalia
22  in the Passenger Division?
23     A.   Yes.
24     Q.   What was his title?
25     A.   I believe it was director of alliances.

Page 48

LORUSSO
1
2      Q.   Wasn't it director of sales and alliances?
3      A.   That could be, yes.
4      Q.   Do you know when Tim O'Neill came back to
5   Alitalia in that capacity?
6      A.   It was either 2003 or 2004.  2003, I
7   think.  2003, I believe.
8      Q.   Had you held that position of director of
9   sales and alliances?
10     A.   No.
11     Q.   So Tim O'Neill wasn't taking that position
12  away from you when he got it?
13     A.   No.
14     Q.   When was Tim O'Neill given your position?
15     A.   It was throughout the time that our boss
16  was Guilio Libutti.
17     Q.   Mr. Libutti came in the summer of 2003; is
18  that correct?
19     A.   I believe so.
20     Q.   So starting when Mr. Libutti came and
21  continuing onward Mr. Libutti was giving your
22  responsibilities to Tim O'Neill?
23     A.   Slowly, yes.
24     Q.   You say that Mr. Gallo told you that he
25  told Mr. Libutti that this was sex discrimination

Page 49

LORUSSO
1
2   and that it was illegal in the U.S.?
3      A.   I'm sorry, repeat your question.
4           (Testimony was read back.)
5      A.   Yes.
6      Q.   Yes is the answer.
7           You probably answered this but now that we
8   are talking about it, can you recall approximately
9   when Mr. Gallo told you that he told this to
10  Libutti?
11     A.   I don't recall.
12     Q.   You don't recall when Gallo told you?
13     A.   Right.
14     Q.   Do you know if Gallo told you when he told
15  this to Libutti?
16     A.   Do I recall —
17     Q.   Well, he could have said it in 2003,
18  apparently, he could have said it in 2004.  Libutti
19  was there until 2006.
20          Do you have any idea when Gallo said to
21  Libutti, this is sex discrimination, it's illegal?
22     A.   It had to have been after I first made a
23  complaint.
24     Q.   Would that be around September of 2004?
25     A.   That would be in the summer of 2004.

13 (Pages 46 to 49)

Ester Lorusso                                                              12/19/2007

Page 82

LORUSSO

1          LORUSSO
2     A.  I don't recall.
3     Q.  Did he ever tell you of any private
4  expression of contempt for older employees by any
5  leader of the company based upon age?
6     A.  Let's go back to the previous question
7  which was public.
8     Q.  Yes.
9     A.  He told me that when Libutti left, he
10  announced to everyone, I am so happy.  One of my
11  greatest accomplishments here was to get rid of the
12  older folks and put in younger blood, or something
13  to that effect.
14     Q.  Okay.  Were you present to hear Libutti's
15  statement?
16     A.  I was not.
17     Q.  Did Mariotti tell you where Libutti was
18  when he said this?
19     A.  Yes.  He was in one of the corridors on
20  the 37th floor.
21     Q.  So this wasn't a general announcement.  It
22  was made to some people in the corridor?
23     A.  No.
24     Q.  It was a general announcement?
25     A.  No.  It was just -- he said it out loud.

Page 83

LORUSSO

1
2     Q.  He said it out loud and Mariotti overheard
3  it or was it a statement made to Mariotti, if you
4  know?
5     A.  I don't recall.
6     Q.  Did Mariotti mention if anybody else was
7  around?
8     A.  I believe he did.
9     Q.  Did he mention who?
10     A.  He may have.
11     Q.  But you don't recall?
12     A.  No.
13     Q.  Then the question was, did Mariotti ever
14  tell you of any instances in which leaders of the
15  company privately expressed contempt for older
16  employees?
17     A.  Well, yes.  I just told you about the
18  older woman.
19     Q.  Oh, that was said one-on-one?
20     A.  Between Libutti and Mariotti.
21     Q.  Okay.  Any other instances where Libutti
22  or any other leader of the company expressed
23  privately some contempt for older employees?
24     A.  Not privately but let's go back to
25  publicly.  As you're speaking things are coming up.

Page 84

LORUSSO

1
2     Q.  That's good.
3     A.  I don't know if I would label this as
4  contempt, however, when Libutti and Galli first came
5  to New York they addressed the entire company and
6  the first words out of Galli's mouth were, I'm not
7  going to say much because speeches are like women's
8  skirts.  The shorter, the better.
9     Q.  Okay.  You heard him say that?
10     A.  I most certainly did.
11     Q.  Did he say anything -- did you ever hear
12  Galli say anything else that you considered to be
13  disrespectful of older employees?
14     A.  No.  I don't recall.
15     Q.  Actually, I assume that that's a comment
16  that's really in regard as being disrespectful or
17  contemptuous of women rather than older employees?
18     A.  You're right.
19     Q.  So you are anticipating my question.  If
20  you cannot think of anything else regarding older
21  employees, let us go on to statements -- other than
22  the one that you just mentioned made by Galli -- in
23  which leaders of the company openly expressed
24  contempt to women.
25          Galli made that comment.  Can you recall

Page 85

LORUSSO

1
2  Mariotti telling you of any statements that leaders
3  of the company made openly expressing contempt for
4  women?
5     A.  No, not openly.
6     Q.  Okay.  What about privately?  Any comments
7  in which leaders -- that Mariotti reported to you --
8     A.  Oh, I'm sorry.  Can I go back to publicly?
9     Q.  Of course.
10     A.  Gabriele Mariotti told me that at Marco
11  D'Ilario's good-bye party at his home --
12     Q.  Yes?
13     A.  -- Libutti said in front of a number of
14  people something to the effect that I am leaving and
15  I'm happy to be leaving so I don't have to worry
16  about discrimination charges anymore.  I could say
17  what I want now.
18     Q.  Did he then proceed to say what he wanted?
19  Did he say anything contemptuous of women or older
20  people or homosexuals?
21     A.  Not that I know of.
22     Q.  You weren't present?
23     A.  I was not.
24     Q.  This was a party at Marco D'Ilario's home
25  for Libutti?

22 (Pages 82 to 85)

One Penn Plaza, NYC
email@tobyfeldman.com

Toby Feldman, Inc.
NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS

tel (212) 244.3990
tel (800) 246.4950

Ester Lorusso                                                                12/19/2007

Page 86

LORUSSO

1  A.  That's correct.
2  Q.  Now, back to the question of whether you
3  heard any leaders of the company openly express
4  contempt for females apart from what you've already
5  told us, can you think of anything else that
6  Gabriele Mariotti told you?
7  A.  Not at this time.
8  Q.  Did Mariotti tell you that he heard
9  Libutti said this or that he heard from somebody
10 else that Libutti said this?
11 A.  He heard him say it.
12 Q.  Now, did Mariotti report any instances in
13 which leaders of the company privately expressed
14 contempt for females?
15 A.  Yes.
16 Q.  What was that?
17 A.  I don't recall the specifics.
18 Q.  Just in general you recall that he said
19 that?
20 A.  Yes.
21 Q.  That Mariotti said — did he give you
22 specific instances or he just said generally, they
23 don't respect women?
24 A.  I don't recall.

Page 87

LORUSSO

1  Q.  Okay. Did Mariotti give you examples of
2  instances? Did he give you any occasions in which
3  leaders of the company openly expressed contempt for
4  homosexuals?
5  A.  I don't recall.
6  Q.  Did he give you any instances in which
7  leaders of the company privately expressed contempt
8  for homosexuals?
9  A.  I don't recall.
10 Q.  Did you personally ever hear any leader of
11 the company express contempt for homosexuals?
12 A.  Yes, but it was a long time ago.
13 Q.  Meaning before 2004?
14 A.  Yes.
15 Q.  Are you aware that Gabriele Mariotti is
16 homosexual?
17 A.  That's a difficult question to answer.
18 Q.  Has he ever told you -- has Gabriele
19 Mariotti ever told you that he is homosexual?
20 A.  No. He has not.
21 Q.  Did you ever hear anybody make denigrating
22 remarks about Gabriele Mariotti because they thought
23 he was homosexual?
24 A.  No.

Page 88

LORUSSO

1  Q.  Did you ever hear anybody make denigrating
2  remarks about Francesco Gallo because they thought
3  he was homosexual?
4  A.  Yes.
5  Q.  Yes?
6  A.  Yes.
7  Q.  Whom did you hear do that?
8  A.  There were rumors in the company about it.
9  Q.  Did you ever hear any leader of the
10 company specifically say something about Gallo being
11 homosexual?
12 A.  No.
13 Q.  Were those rumors sparked because of a
14 person named Dursun Oksus, the rumors about Gallo?
15 A.  Yes.
16 Q.  Before that you hadn't heard rumors about
17 Gallo being homosexual?
18 A.  I don't believe so.
19 Q.  Was this because it was thought that Gallo
20 had promoted Oksus as the vice president of
21 regulatory affairs because of a homosexual liaison
22 between the two of them?
23 A.  That was the rumor.
24 Q.  That was the rumor, yes.

Page 89

LORUSSO

1  Can you recall any specific person who
2  spread that rumor or endorsed that rumor?
3  A.  No. But it was a rumor.
4  Q.  It was in the air?
5  A.  It was in the air. Thank you.
6  Q.  Did you yourself ever pass that rumor on?
7  A.  No.
8  Q.  I'm pretty sure I know the answer to this
9  question, but in your conversations with Mr. Gallo,
10 did you ever discuss the rumors about him and Mr.
11 Oksus, with Mr. Gallo?
12 A.  No.
13 Q.  Did you ever discuss the rumors about Mr.
14 Gallo and Oksus with Mariotti?
15 A.  Yes.
16 Q.  What do you recall about any such
17 discussion?
18 A.  Well, it was a position that I wanted at
19 the time, that is, Oxsus's position.
20 Q.  The vice president of regulatory affairs?
21 A.  That is correct.
22 Q.  Okay.
23 A.  So the discussion between me and Mariotti
24 revolved around why would someone who barely speaks

23 (Pages 86 to 89)

Page 90

LORUSSO

1
2  English, is totally incompetent, be placed in that
3  position when I wasn't even considered.
4      Q.  All right.  What did Mr. Mariotti say?
5      A.  He basically repeated what I just said.
6      Q.  He said, Why would --
7      A.  Yes.
8      Q.  Did Mr. Mariotti indicate that he heard
9  the rumors and the reason was that Mr. Oksus was a
10  paramour of Mr. Gallo's?
11      A.  I don't remember the specifics of what was
12  said but the general conversation revolved around
13  that.
14      Q.  I'm sure I know the answer to this
15  question as well, but you never discussed these
16  rumors with Mr. Oksus?
17      A.  No.  That's an emphatic no.
18      Q.  Specifically, do you recall any other
19  discussions of these rumors about Gallo and Oksus or
20  is it just an in-the-air kind of thing?
21      A.  It was in the air.
22      Q.  Do you recall if Mr. Mariotti specifically
23  mentioned Dolores Kitzig as the person about whom
24  denigrating remarks were made because she is old?
25      A.  I don't recall.

Page 91

LORUSSO

1
2      Q.  Did Mariotti mention that he was told to
3  fire Dolores Kitzig because she's old?
4      A.  I'm sorry.  I didn't hear what you said.
5  I thought you said Laurus.  Dolores, that's her
6  name.  She is the chicken.
7      Q.  She is the old chicken?
8      A.  Correct.  She is the one I referred to
9  before, yes.
10      Q.  Do you know if she was ever fired?
11      A.  I don't know.
12      Q.  Was she still at the company when you
13  left?
14      A.  I don't know.
15      Q.  You don't know?
16      A.  I don't know.
17      Q.  On Mariotti you further state that he
18  resides in Manhattan.  Do you know if that's a fact?
19      A.  Actually, it's not.
20      Q.  Where is he residing now?
21      A.  I'm not quite sure, but he had a place
22  upstate and he also had a place in Queens.
23          He was very secretive about where he was
24  living, to be honest with you.  Not secretive.  I
25  shouldn't say that.  It was just not up for

Page 92

LORUSSO

1
2  discussion.
3      Q.  Okay.  He certainly never invited you to
4  any of his places?
5      A.  No.
6      Q.  Have you ever invited him to your
7  apartment, Mariotti?
8      A.  I think so.
9      Q.  Do you remember if he came?
10      A.  I believe so.
11      Q.  Do you recall how long ago?
12      A.  Yes, yes.  He did come over one evening,
13  yes.
14      Q.  About how long ago was that?
15      A.  It must have been a while back because I
16  hardly remember.  But he did come over, yes.
17      Q.  When is the last time you communicated
18  with Howard Tiegel?
19      A.  When he was at the company.
20      Q.  This was in 2002?
21      A.  Yes.
22      Q.  So you had no communications with him
23  since?
24      A.  No, I haven't.
25      Q.  There is a statement here that Tiegel can

Page 93

LORUSSO

1
2  "describe how the New York office made
3  discriminatory employment decisions during Ms.
4  Lorusso's employment."  This is paragraph 3.
5          I assume these are decisions that were
6  made while Mr. Tiegel was still there?
7      A.  Yes.
8      Q.  And he left in 2002 or 2003?
9      A.  I don't remember exactly when he left.
10      Q.  And "how the company had no regard for
11  American employment laws."
12          Did you ever hear Mr. Tiegel say that?
13  Did you ever hear him say that?
14      A.  No.
15      Q.  Did anybody ever tell you that he said
16  that?
17      A.  I don't think so.
18      Q.  In paragraph 3 the second time around, the
19  next paragraph 3, we have Mr. Mengozzi, who was a
20  former CEO of Alitalia.  The statement says that he
21  "directed the managing director in New York to push
22  out the older workers in New York and replace them
23  with younger employees."
24          First, did you ever hear Mr. Mengozzi give
25  such a direction?

24 (Pages 90 to 93)

One Penn Plaza, NYC                    Toby Feldman, Inc.              tel (212) 244.3990
email@tobyfeldman.com      NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS      tel (800) 246.4950

Ester Lorusso                                                    12/19/2007

Page 110

LORUSSO

1
2  Libutti's behavior toward you once you went into
3  GA2000 —
4     A.  No.
5     Q.  — with Elizabeth?
6        All right.  Did you, at the time that you
7  were still in marketing, discuss with Elizabeth Mr.
8  Libutti's alleged harassing of you?
9     A.  I may have.
10    Q.  You're not sure?
11    A.  I'm not sure.
12    Q.  How about Mr. Libutti's berating you?  Do
13  you recall discussing that with Elizabeth?
14    A.  Yes.
15    Q.  You do recall that?  What do you recall
16  discussing with Elizabeth back when were you in
17  marketing about Mr. Libutti's berating you?
18    A.  I remember one incident.  We were in
19  Washington at a hotel and Libutti screamed at me in
20  the lobby of the hotel.  And I remember discussing
21  it with Elizabeth.
22    Q.  What was Mr. Libutti screaming at you
23  about?
24    A.  I believe he wanted good-looking girls in
25  skirts to be at the door or something to that

Page 111

LORUSSO

1
2  effect, and I didn't deliver it or something to that
3  effect.
4        I would need to check my notes for this.
5     Q.  This was the launch of the Washington
6  office?
7     A.  Yes.
8        MS. KURZON:  Put on your mike, please.
9        MR. KORAL:  You're picking her up anyway?
10       Okay, good.
11    Q.  Mr. Libutti was unhappy because you used
12  regular Alitalia staff to be the greeters and he
13  thought you should hire models?
14    A.  That's correct.
15    Q.  I read your notes.
16       That's what he was screaming at you about?
17    A.  That, and he kept trying to reach me on my
18  cell phone but he was calling me on my office phone.
19  So he thought I was purposely avoiding him.
20    Q.  He was leaving messages on your office
21  phone?
22    A.  Right.  I didn't find out until I got back
23  to the office in New York.
24    Q.  You don't check your office phone when
25  you're out of town?

Page 112

LORUSSO

1
2     A.  I believe it was the next day.  It was an
3  evening event.
4     Q.  And Elizabeth heard Mr. Libutti yelling at
5  you about those two things —
6     A.  I believe she did.
7     Q.  — about the greeters and about the
8  telephone.  You believe she did?
9     A.  Yes.
10    Q.  And you believe you discussed it with her?
11    A.  Yes.
12    Q.  What did she say?
13    A.  I don't recall.
14    Q.  Do you recall what you said?
15    A.  No.
16    Q.  Have you asked Elizabeth to be a witness
17  for you in this case?
18    A.  No.  I have not.
19    Q.  Stephanie Di Clemente, she was in HR,
20  correct?
21    A.  Yes.
22    Q.  When is the last time you communicated
23  with her?
24    A.  I literally bumped into her in the street.
25    Q.  About how long ago?

Page 113

LORUSSO

1
2     A.  I don't recall.
3     Q.  Within the last year?
4     A.  Yes.
5     Q.  Did you have any conversation about your
6  termination?
7     A.  I believe I communicated to her that I was
8  no longer with Alitalia.
9     Q.  What's she doing these days?
10    A.  She is working in human resources for Polo
11  Ralph Lauren.
12    Q.  Other than telling her that you've been
13  terminated, did you have any other discussion about
14  Alitalia with Ms. Di Clemente when you ran into her?
15    A.  Yes.
16    Q.  And you haven't communicated with her
17  since?
18    A.  No.
19    Q.  Did she give you her card?
20    A.  Yes, she did.
21    Q.  But you haven't called her?
22    A.  No.
23    Q.  Or e-mailed her?
24    A.  No.
25    Q.  Do you know whether your attorneys have

29 (Pages 110 to 113)

Ester Lorusso                                                    12/19/2007

Page 122

LORUSSO
1
2   Sciarresi had said that the company has no regard
3   for employment laws?
4       A.   I don't recall.
5       Q.   Did anybody ever tell you that Mr.
6   Sciarresi had described how discriminatory practices
7   impacted his employment with Alitalia?
8       A.   I don't recall.
9       Q.   Finally, did anybody ever tell you that
10  Mr. Sciarresi had described how discriminatory
11  practices impacted your employment with Alitalia?
12      A.   I don't recall if my attorney at the time
13  had made a comment or not.
14      Q.   "At the time" you mean Mr. Behrins?
15      A.   Yes, I do.
16      Q.   Since he was your attorney, don't tell me
17  anything further about what he said because I'm not
18  supposed to ask and you're not supposed to tell.
19          What is your basis for stating in
20  paragraph 10 that Mr. Libutti repeatedly made racist
21  remarks?
22      A.   Mostly through conversations with Gabriele
23  Mariotti.
24      Q.   You never heard Mr. Libutti make a racist
25  remark; is that right?

Page 123

LORUSSO
1
2       A.   I may have, but I don't recall.
3       Q.   Did anybody ever tell you that Mr.
4   Libutti repeatedly made racist remarks?
5       A.   Gabriele Mariotti.
6       Q.   Just Mariotti. Did he describe any
7   remarks to you?
8       A.   It's not just Gabriele Mariotti, by the
9   way.
10      Q.   Let's finish with him and we'll go on to
11  whoever else it was.
12          Did Mr. Mariotti describe any of these
13  remarks to you or repeated them?
14      A.   He may have.
15      Q.   You don't recall anything specific?
16      A.   I don't recall anything specific.
17      Q.   But you recall his saying in general
18  terms, Libutti makes racist remarks?
19      A.   Yes.
20      Q.   Any races in particular that Mr. Mariotti
21  claimed Mr. Libutti was making remarks about?
22      A.   I don't recall.
23      Q.   This also says that Libutti, "upon
24  information and belief Libutti repeatedly made
25  sexist remarks."

Page 124

LORUSSO
1
2          You've described one such remark. Did you
3   hear any others?
4       A.   I don't recall.
5       Q.   Did anybody ever report to you that Mr.
6   Libutti had made sexist remarks?
7       A.   Gabriele did.
8       Q.   Do you recall what remarks Mr. Mariotti
9   said Mr. Libutti had made? Do you recall the
10  contents of any?
11      A.   No.
12      Q.   You said before that Mariotti was not the
13  only one who reported to you that Libutti had made
14  racist remarks?
15      A.   Yes.
16      Q.   Who else did?
17      A.   Francesco Gallo.
18      Q.   Gallo said so?
19      A.   Mm-hm.
20      Q.   Did you ever hear Gallo make racist
21  remarks, by the way --
22      A.   No.
23      Q.   -- of his own?
24      A.   No.
25      Q.   What remarks did Mr. Gallo report to you

Page 125

LORUSSO
1
2   Libutti made that he regarded as racist?
3       A.   I don't recall.
4       Q.   Did Gallo mention which races Libutti was
5   making remarks about that you can recall?
6       A.   I can't recall.
7       Q.   Did anybody other than Mariotti report to
8   you that Libutti made sexist remarks?
9       A.   Francesco Gallo.
10      Q.   Did Mr. Gallo give any specific sexist
11  remarks that Mr. Libutti allegedly made?
12      A.   I can't recall.
13      Q.   You said that Mr. Libutti participated in
14  discriminatory employment decisions and policies
15  that adversely impacted you.
16          Let me ask, first, did Mr. Libutti
17  participate in any decision to terminate you that
18  you are aware of?
19      A.   To terminate me?
20      Q.   Yes.
21      A.   He started the chain of events that led to
22  my termination.
23      Q.   Did Mr. Libutti have anything to do with
24  the Cargo department?
25      A.   I believe Mr. Libutti was no longer

One Penn Plaza, NYC                    Toby Feldman, Inc.                     tel (212) 244.3990
email@tobyfeldman.com       NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS      tel (800) 246.4950

Page 126

LORUSSO

1  LORUSSO
2  employed, at the time.
3      Q.  But first answer my question which has to
4  do, Mr. Libutti have anything to do with the Cargo
5  department?
6      A.  No.
7      Q.  Do you know if Mr. Libutti was the person
8  who arranged for you to get a job in the Cargo
9  department in 2006?
10     A.  No.
11     Q.  Do you know whether he had any influence
12 on that placement, I'll call it, or on that job
13 opportunity?
14     A.  I don't know.
15     Q.  As you mentioned, Mr. Libutti was, in
16 fact, no longer employed at Alitalia at the time of
17 your termination, correct?
18     A.  That is correct.  I believe that's
19 correct.
20     Q.  He certainly was no longer in New York at
21 the time, correct?
22     A.  Right.
23     Q.  You said earlier that Mr. Libutti said --
24 I don't want to put words in your mouth -- but
25 essentially set in motion the chain of events that

Page 127

LORUSSO

1  led to your termination?
2      A.  That's correct.
3      Q.  What are you referring to specifically?
4      A.  Mr. Libutti step-by-step was taking away
5  my responsibilities and giving them to my male
6  counterpart.
7      Q.  You mean Tim O'Neill?
8      A.  Tim O'Neill.
9      Q.  And so you consider that is how Mr.
10 Libutti --
11     A.  -- began --
12     Q.  -- began the process of your termination?
13     A.  Correct.
14     Q.  The first thing he did was to promote you
15 to GA2000, correct?
16         MS. KURZON:  Objection to the term
17 "promote."  Transferred?
18     Q.  Weren't you promoted to GA2000?
19     A.  I was transferred to G A 2000.
20     Q.  What was your salary before you went to
21 GA2000?
22     A.  Eighty thousand.
23     Q.  What was your salary when you were at
24 GA2000?

Page 128

LORUSSO

1  LORUSSO
2      A.  A hundred and five.
3      Q.  So you had a salary increase of more than
4  25 percent when you went to GA2000?
5      A.  Right.  The salary increase came by way of
6  my refusing to go to GA2000, and Libutti would come
7  back with a higher amount in order to entice me to
8  go to GA2000.
9      Q.  What was your title at GA2000?
10     A.  Managing director.
11     Q.  What was your title before you went to
12 GA2000?
13     A.  Director of managing.
14     Q.  Is a managing director higher than a
15 director?
16     A.  Managing director of a sinking ship is not
17 higher than a director of marketing in a company
18 that was sound.
19     Q.  But you were managing director at GA2000,
20 correct?
21     A.  Yes, I was.
22     Q.  And you were just a director when you were
23 in Passenger?
24     A.  Yes, I was.
25     Q.  Your salary was 80,000?

Page 129

LORUSSO

1  LORUSSO
2      A.  That's correct.
3      Q.  And went up to 105,000?
4      A.  That's correct.
5      Q.  Did Mr. Libutti tell you that GA2000 was a
6  sinking ship?
7      A.  Everyone knew it was a sinking ship.
8      Q.  The question is whether Mr. Libutti did?
9      A.  No.  He did not.
10     Q.  Did Mr. Gallo say so?
11     A.  No. He did not.
12     Q.  Did anybody say so specifically?
13     A.  I don't believe so.
14     Q.  But it was sort of common knowledge?
15     A.  It was common knowledge that Alitalia was
16 closing companies, subsidiary companies that it
17 owned.
18     Q.  Okay.  And GA2000 was a subsidiary
19 company?
20     A.  Yes, it was.
21     Q.  So the conclusion was that it might be on
22 the list, so to speak, of things to be closed?
23     A.  That's correct.
24     Q.  I believe that you claimed that you made a
25 profit when you were at GA2000.

Ester Lorusso                                                                 12/19/2007

Page 130

LORUSSO
1  
2      A.   Only for the first few months.
3      Q.   Only for the first few months?
4      A.   Right.
5      Q.   What happened after that?
6      A.   The company was systemically being ignored
7  by Alitalia. There were a lot, a lot of problems
8  and it was quite obvious about the direction it was
9  headed.
10     Q.   That was within the first few months?
11     A.   Yes.
12     Q.   How many employees did you supervise or,
13 were there in GA2000, is probably a better way to
14 put it?
15     A.   Between 16 and 18.
16     Q.   Sixteen and 18?
17     A.   I believe so.
18     Q.   They didn't all report directly to you, I
19 assume. There were some supervisors and managers
20 and so on?
21     A.   That is correct.
22     Q.   But the total head count for GA2000 was in
23 the range from 16 to 18?
24     A.   Yes. I believe I reduced it when I got
25 there, but it was around that range.

Page 131

LORUSSO
1  
2      Q.   Was that a decision that you made
3  yourself?
4      A.   Yes.
5      Q.   You selected the people to be terminated?
6      A.   Yes.
7      Q.   These were job eliminations?
8      A.   I don't recall.
9      Q.   Did you fire some people for just poor
10 performance?
11     A.   It may have been, but I don't recall. I
12 would need to take a look at my notes.
13     Q.   Well, we'll get back into GA2000 later.
14     Isn't it true that your salary at GA2000
15 was, in fact, continued by Alitalia? That it wasn't
16 paid by GA2000?
17     A.   That's correct.
18     Q.   You remained an Alitalia employee --
19     A.   Yes, I did.
20     Q.   -- while you were at GA2000?
21     Isn't it true that after GA2000 was
22 closed, which I think was maybe November 1, 2006 --
23     A.   Correct.
24     Q.   2005?
25     A.   Five.

Page 132

LORUSSO
1  
2      Q.   You continued on your managing director
3  salary until you took your position in Cargo in
4  April of 2006?
5      A.   That's correct.
6      Q.   If you look at the very last page of this
7  exhibit you'll see what appears to be a news clip
8  mentioning you as a manager of marketing
9  communications at Alitalia, Ms. Lorusso.
10     A.   Yes.
11     Q.   Do you recall what publication this is
12 from?
13     A.   Travel Agent Magazine.
14     Q.   The date is obscure. Do you recall the
15 date?
16     A.   No, I don't.
17     Q.   It was in 1997 perhaps?
18     A.   Could be.
19     Q.   You were named one of the -- I can't
20 remember the exact title, but one of the
21 up-and-coming women in travel around that time, as
22 well?
23     A.   That's correct.
24     Q.   This was the only document that your
25 attorneys produced to us at the time, in July when

Page 133

LORUSSO
1  
2  this document was given to us. Subsequently other
3  documents were produced, but just last week we were
4  sent over 350 pages of documents which your
5  attorneys represented to us you had just turned over
6  to them.
7      Is that correct?
8      A.   That's correct.
9      Q.   Where did those documents come from, the
10 350 that you gave your attorneys last week?
11     A.   I had them.
12     Q.   At home?
13     A.   Yes.
14     Q.   Why did you not turn them over to your
15 attorneys sooner?
16     A.   I didn't know that I had to turn over
17 every document that I had.
18     MS. KURZON:  I object to this questioning
19     to the extent it calls for attorney-client
20     privilege.
21     MR. KORAL:  Well, I am not asking her what
22     you told her to do or what she told you. I'm
23     just asking why were they there that long.
24     Q.   The answer is you didn't understand that
25 you should turn over documents?

34 (Pages 130 to 133)

Page 146

LORUSSO

1
2    Q.   Around the country to find --
3    A.   Not around the country, no.
4    Q.   Just around New York?
5    A.   Yes.
6    Q.   Why did you hate the job?
7    A.   It was a concept that was incredibly tough
8    for people to grab.
9    Q.   So it was a hard sale?
10   A.   It was an extremely hard sale.
11   Q.   Were there other people involved in sales
12   besides yourself? Sales for Hanger, I mean.
13   A.   Yes.
14   Q.   Were they more successful than you at
15   making these hard sales?
16   A.   No.
17   Q.   Was the company not making money at this
18   point?
19   A.   No.
20   Q.   It's not?
21   A.   No, it's not.
22       MR. KORAL:  Well, any documentation that
23   we have of any of her job searches from the
24   time she started while still at Alitalia until
25   her -- until the present, really, I think would

Page 147

LORUSSO

1
2    be relevant. I'd like to see. So we'll make
3    that document request.
4        We're going to mark now as Defendant's
5    Exhibit 2 plaintiff's response to defendant's
6    first interrogatories.
7        (Defendant's Exhibit 2, response, was
8    marked for identification as of this date.)
9    Q.   Ms. Lorusso, have you had an opportunity
10   to look through this?
11   A.   Yes.
12   Q.   Is that your signature on the very last
13   page of this document?
14   A.   Yes.
15   Q.   Did you read through this document on
16   September 11, 2007?
17   A.   Yes.
18   Q.   Do you recall that you agreed with
19   everything that was there?
20   A.   Yes.
21   Q.   I have just a few questions about this
22   document.
23       On page 35 we have interrogatory number 6.
24   "Please identify each person whom you know or
25   believe has knowledge or information concerning the

Page 148

LORUSSO

1
2    qualifications of any persons hired by Alitalia for
3    the jobs listed in paragraph 4G above, and give the
4    basis for your belief."
5        Now let's look at paragraph 4G, which is
6    on the proceeding page. The first one is vice
7    president of regulatory affairs. There are four
8    jobs, actually, listed there, vice president of
9    regulatory affairs, director of regulatory affairs,
10   either of the two positions in marketing and sales
11   that opened in 2006 as alleged in paragraph 43 of
12   the complaint. Those positions.
13       Let me ask you first, the positions in
14   marketing and sales that opened up, can you tell me
15   which those were? And if you want, we can look at
16   the complaint which is on the next exhibit.
17       I'll just read you paragraph 43 for now
18   which is, "two positions in plaintiff's area of
19   expertise, marketing and sales, opened up." Now,
20   this appears to be in the fall of 2006.
21       Do you know which two positions you are
22   referring to?
23   A.   Yes. One is the position given to Lucia
24   Alla. I don't recall the exact title of her
25   position.

Page 149

LORUSSO

1
2    Q.   Okay. Is that in marketing or sales?
3    A.   Marketing.
4    Q.   And what's the other? What is the sales
5    position that opened up?
6    A.   The sales position was the director of
7    sales.
8    Q.   Who got that position?
9    A.   The name slips my mind -- oh, Nicola
10   Arnese.
11   Q.   Nicola is a man?
12   A.   I think that's his name.
13   Q.   Arnese is A-R-N-E-S-E, correct?
14   A.   Yes. That's correct.
15   Q.   Do you know when the position that went to
16   Lucia Alla opened up?
17   A.   The exact date? No.
18   Q.   Around when?
19   A.   It was after Gabriele Mariotti left.
20   Q.   Which was around October of 2006, correct?
21   A.   That's correct.
22   Q.   This was a replacement for Mr. Mariotti?
23   A.   I believe the position was reclassified or
24   the responsibilities may have changed.
25   Q.   Mr. Mariotti was in charge of customer

One Penn Plaza, NYC
email@tobyfeldman.com

Toby Feldman, Inc.
NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS

tel (212) 244.3990
tel (800) 246.4950

Ester Lorusso                                                    12/19/2007

Page 150

LORUSSO
1
2  service as well as pricing?
3      A.  Yes.
4      Q.  Is either of those a marketing position?
5      A.  Well, customer relations was under me so
6  it was definitely a marketing position.
7      Q.  Was under you when?
8      A.  When I was the director of marketing.
9      Q.  For how long?
10     A.  Three years.
11     Q.  Lucia Alla is a female?
12     A.  Yes.
13     Q.  Do you know her approximate age?
14     A.  About 50.
15     Q.  Approximately your age?
16     A.  Approximately my age.
17     Q.  Do you know what her experience was at
18  Alitalia?
19     A.  She was the sales manager.
20     Q.  Had she been at Alitalia a long time?
21     A.  I believe she has.
22     Q.  As long as you, as far as you know?
23     A.  I don't think so.  I don't know.
24     Q.  As sales manager, what kind of sales --
25  did she have a specific niche as sales manager?

Page 151

LORUSSO
1
2      A.  I believe it was -- to the best of my
3  knowledge it was corporate sales.
4      Q.  And that was her position prior to
5  becoming whatever she became in marketing that you
6  felt you were qualified for?
7      A.  That is correct.
8      Q.  Did you talk to anybody about that
9  position in marketing?
10     A.  Yes, I did.
11     Q.  To whom?
12     A.  To my boss at the time.
13     Q.  Your boss at the time was whom?
14     A.  Walter Longo.
15     Q.  What did Walter Longo say?
16     A.  I don't recall.
17     Q.  He was, of course, in the Cargo Division,
18  correct?
19     A.  Correct.
20     Q.  Did you speak to anybody in the Passenger
21  Division about that?
22     A.  No, I did not.
23     Q.  Did you speak to anybody in HR about Lucia
24  Alla's position?
25     A.  No, I did not.

Page 152

LORUSSO
1
2      VIDEOGRAPHER:  One minute.
3      MR. KORAL:  We are going to have to go off
4  the record for a minute because the tape is
5  out.
6      VIDEOGRAPHER:  The time is now 1:02 p.m.
7  This concludes tape number 2 of the videotape
8  deposition of Ms. Ester Lorusso.
9      (A break was taken.)
10     VIDEOGRAPHER:  This is tape number 3 of
11  the videotape deposition of Ms. Ester Lorusso.
12     The time is now 1:04 p.m.  We're back on
13  the record.
14     Q.  What is the basis for your information
15  that Ms. Alla does not have the same job
16  responsibilities that Mr. Mariotti had?
17     A.  I don't believe -- repeat your question.
18     Q.  What's the basis for your belief that Ms.
19  Alla does not have the same position that Mr.
20  Mariotti had?
21     A.  I thought they had changed the
22  responsibilities, but I'm not sure.
23     Q.  Did anybody tell you that?
24     A.  I don't recall.
25     Q.  You never discussed it with Lucia Alla,

Page 153

LORUSSO
1
2  did you?
3      A.  No, I did not.
4      Q.  And Mr. Mariotti was gone, so you couldn't
5  have discussed it with him, correct?
6      A.  Yes.  That's correct.
7      Q.  Do you recall discussing it with anybody?
8      A.  No.
9      Q.  I am told that her title was director of
10  sales and marketing coordination which I understand
11  is the same title that Mr. Mariotti had.
12     Do you have any information that Mr.
13  Mariotti had a different title?
14     A.  When I was the director of marketing he
15  did have a different title, so that was changed
16  afterwards.
17     Q.  That was in 2004?
18     A.  Right.
19     Q.  Are you aware whether Mr. Mariotti got a
20  promotion in May of 2006?
21     A.  I'm not aware.
22     Q.  Had he previously been responsible for
23  customer relations?
24     A.  Who?
25     Q.  Mariotti, prior to May of 2006.

39 (Pages 150 to 153)

Ester Lorusso                                              12/19/2007

Page 154

LORUSSO

1
2  A.  I don't know.
3  Q.  Now, the job given to Nicola Arnese, you
4  said this was called director of sales?
5  A.  That's correct.
6  Q.  And you felt you qualified for that job?
7  A.  Yes.
8  Q.  What was your background, managerial
9  background in sales?
10  A.  Managing director of GA2000.
11  Q.  You consider that a sales position?
12  A.  Yes, I do.
13  Q.  Prior to going into GA2000, what was your
14  experience with sales?
15  A.  Well, marketing is an extension of sales.
16  Q.  In your opinion marketing and sales --
17  marketing is an extension of sales?
18  A.  Well, they work hand in hand.  We tried
19  not to have separate departments saying this is just
20  marketing and that's just sales.
21  Q.  But as director of marketing you were
22  primarily involved with advertising, weren't you?
23  A.  Advertising, customer relations, I needed
24  to interact with sales so we can work with them and
25  provide for their needs.

Page 155

LORUSSO

1
2  Q.  You interacted with sales?
3  A.  Yes, of course.
4  Q.  Had you held any management position in
5  sales prior to GA2000?
6  A.  No.
7  Q.  And you regarded the GA2000 as primarily a
8  sales position?
9  A.  Yes, sir.
10  Q.  Wasn't it an executive position, managing
11  people?
12  A.  We were in the business of selling
13  tickets, so it was a sales --
14  Q.  Did you make sales calls?
15  A.  Yes, I did.
16  Q.  With what frequency?
17  A.  Oh, I would say a few times a week.
18  Q.  All right.  You were making sales calls on
19  whom, on what kind of businesses?
20  A.  Travel agencies.
21  Q.  Do you know what the director of sales
22  position involves?
23  A.  Yes, I do.
24  Q.  Does the director of sales make sales
25  calls?

Page 156

LORUSSO

1
2  A.  Yes.  He does or she does.
3  Q.  On travel agencies?
4  A.  That is one of the accounts.
5  Q.  What other kinds of accounts does the
6  director of sales make calls on?
7  A.  Corporations.
8  Q.  All right.  Anything else?
9  A.  That about covers it for that position.
10  Q.  Are these the same kind of travel agencies
11  that GA2000 calls on?
12  A.  Yes.
13  Q.  The same?
14  A.  Part of them, yes.
15  Q.  Wasn't the major business of GA2000 ethnic
16  sales?
17  A.  Yes.  Some of those agencies also sold
18  leisure sales.
19  Q.  But the primary focus of the director of
20  sales is on leisure sales, correct, or agencies that
21  focus on leisure sales?
22  A.  Repeat that question, please.
23  (Testimony was read back.)
24  A.  Yes.
25  Q.  Wasn't Mr. Farrow primarily responsible

Page 157

LORUSSO

1
2  for ethnic sales at GA2000?
3  A.  Yes.
4  Q.  Mr. Farrow remained on the Alitalia
5  payroll the way you did?
6  A.  Yes.
7  Q.  What happened to Mr. Farrow after GA2000
8  closed?
9  A.  I believe he accepted a retirement
10  package.
11  Q.  Do you know when he terminated?
12  A.  I don't recall.
13  Q.  If I told you that it was the end of 2006,
14  would you have any reason to doubt that?
15  A.  No.
16  Q.  All right.  Now, looking now at your
17  response to interrogatory 6 which, remember, asks
18  about people with information regarding the
19  qualifications of anyone hired by Alitalia for any
20  of the four jobs we were talking about, the director
21  of sales, Lucia Alla's position, the director of
22  regulatory affairs and the vice president of
23  regulatory affairs.
24  Does Dursun Oksus have any information
25  regarding the qualifications of Nicola Arnese?

40 (Pages 154 to 157)

Ester Lorusso                                          12/19/2007

Page 158

LORUSSO

1
2     A.   No.
3     Q.   Does he have any information regarding the
4   qualifications of Lucia Alia, as far as you know?
5     A.   No.
6     Q.   So why is Dursun Oxsus's name here?
7     A.   Because he has the information regarding
8   the vice president, VP of regulatory affairs.
9     Q.   Because he got that job?
10     A.   Yes.
11     Q.   What information do you believe he has
12   about the qualifications or his qualifications for
13   VP of regulatory affairs?
14     A.   Information regarding the scope of the
15   work.
16     Q.   Okay.  Did you ever discuss with him
17   whether he had any idea about the scope of the work
18   of the VP of regulatory affairs?
19     A.   No.
20     Q.   Did you ever discuss that with anybody,
21   apart from what you testified about the rumors and
22   so on?
23     A.   Yes.
24     Q.   All right.  With whom?
25     A.   One was Eugene Massimillo.

Page 159

LORUSSO

1
2     Q.   Who was Eugene Massimillo?
3     A.   He is an attorney for -- I can't remember
4   the name of the law firm.  I'm sorry.
5     Q.   Is it a law firm that Alitalia uses?
6     A.   Yes.
7     Q.   It's the law firm that handles regulatory
8   matters for Alitalia?
9     A.   That is correct.
10     Q.   How did you come to have this conversation
11   with Eugene Massimillo?
12     A.   He would speak on a pretty regular basis.
13   We had worked pretty closely because when I was in
14   charge of customer relations we had a lot of
15   interaction.  So in these conversations, these
16   telephone conversations, the matter would arise
17   about Dursun Oksus.
18     Q.   This was before you were in Cargo or while
19   you were in Cargo or both?
20     A.   I don't recall.
21     Q.   What do you recall about your
22   conversations with Mr. Massimillo about Dursun
23   Oksus?
24     A.   He expressed frustration in working with
25   Mr. Dursun.

Page 160

LORUSSO

1
2     Q.   Frustration for what reasons?  Did he give
3   any?
4     A.   Yes.  He said that he was incompetent.
5     Q.   Did he say anything else?
6     A.   He was really incompetent.
7     Q.   As in very incompetent?
8     A.   Extremely incompetent.
9     Q.   Did he give you examples of that?
10     A.   I believe he did.
11     Q.   This was just by way of conversation?
12     A.   Yes.
13     Q.   This occurred, of course, after Mr. Oksus
14   became vice president of regulatory affairs?
15     A.   That is correct.
16     Q.   Which was approximately March of 2007?
17     A.   No.
18     Q.   2006.  I'm sorry.
19     A.   That's okay.
20     Q.   March of 2006.  That wasn't intentional.
21     A.   I understand.  Yes.
22     Q.   You started in Cargo in April of 2006,
23   right?
24     A.   That's correct.
25     Q.   Did you have any business reason to be

Page 161

LORUSSO

1
2   talking to Mr. Massimillo while you were in Cargo?
3     A.   I don't think so.
4     Q.   But you had conversations with him about
5   Mr. Oksus anyway.  Is that fair?
6     A.   Yes.  I did have a business reason.  I
7   remember one day he called me because he had
8   something in Italian that he wanted to know -- from
9   Alitalia and he wanted to know if I would give him a
10   hand with it as far as translation or as far as what
11   the meaning was.
12     Q.   Mr. Massimillo doesn't speak Italian?
13     A.   That's correct.
14     Q.   He doesn't have people in his office who
15   speak Italian, as far as you know?
16     A.   As far as I know.
17     Q.   Have you done this for him before?
18     A.   No.
19     Q.   He kind of picked on you now?
20     A.   No.  We were friendly, as I mentioned.  We
21   were friendly.
22     Q.   When was the last time you spoke with him?
23     A.   A few months ago.
24     Q.   What was the occasion of doing so?
25     A.   He called me to say hi.

41 (Pages 158 to 161)

Ester Lorusso                                                    12/19/2007

Page 162

LORUSSO

1
2     Q.   Did you discuss your lawsuit at all?
3     A.   No.
4     Q.   Have you ever discussed your lawsuit with
5  Mr. Massimillo?
6     A.   No.
7     Q.   Have you ever discussed your belief that
8  you were discriminated against with Mr. Massimillo?
9     A.   Yes.
10    Q.   When did you do that?
11    A.   I don't recall.
12    Q.   Was it in connection with Mr. Oxsus's
13 appointment?
14    A.   Yes.
15    Q.   Did you ever speak with Mr. Massimillo
16 about your feeling about discrimination at any time
17 other than about Mr. Oxsus's appointment?
18    A.   It could be.
19    Q.   Did you ever speak with Franco Gallo about
20 your belief that it was discrimination against you
21 when Oksus was appointed vice president of
22 regulatory affairs?
23    A.   I remember bringing up the subject with
24 him and I remember being immediately dismissed.  In
25 other words, he did not want to have the

Page 163

LORUSSO

1
2  conversation.
3     Q.   Did he walk away?
4     A.   I don't recall.
5     Q.   You don't recall how you got dismissed?
6     A.   Yes.
7     Q.   He didn't yell and scream at you, though?
8     A.   No.
9     Q.   He just shut down --
10    A.   Yes.
11    Q.   -- the discussion?  Did Mr. Massimillo
12 give any examples of Dursun Oxsus's incompetence?
13 And by that I mean things Oksus had done that a vice
14 president of regulatory shouldn't have done?
15    A.   A silly thing comes to mind right now
16 where he kept referring to him in writing as Jene
17 Massimillo, J-E-N-E, rather than his name, Gene,
18 G-E-N-E.
19    Q.   His name is probably Eugene, actually?
20    A.   It is Eugene but everyone knows him as
21 Gene.  Apparently Dursun was working with him for a
22 while and he still kept writing to him as J-E-N-E?
23    Q.   That bugged him?
24    A.   Yes.
25    Q.   But you don't recall any other examples of

Page 164

LORUSSO

1
2  incompetence?
3     A.   I don't recall.
4     Q.   Okay.
5     A.   I don't recall.
6     Q.   What qualifications did you believe you
7  had for the job of vice president of regulatory
8  affairs?
9     A.   I was in charge of customer relations and
10 based on that, that's why I believed I had the
11 qualifications.
12    Q.   Do you know what the vice president of
13 regulatory affairs does?
14    A.   Yes.
15    Q.   Pardon?
16    A.   Yes.
17    Q.   What does the vice president of regulatory
18 affairs do?
19    A.   Deals with government agencies, makes sure
20 the airline is doing the right thing.
21    Q.   That is the FAA?
22    A.   That is correct.
23    Q.   Any other government agencies?
24    A.   I can't recall right now.
25    Q.   Homeland Security?

Page 165

LORUSSO

1
2     A.   Yes.
3     Q.   Any others?
4     A.   I can't recall -- Immigration.
5     Q.   I think that's part of Homeland Security
6  right now.
7         Anyway, do you have any background in
8  dealing with immigration?
9     A.   Yes, because of the fines we used to get
10 and they used to come to the customer relations
11 office.
12    Q.   Fines from whom?
13    A.   When the ticket agents at the airports did
14 not properly check documentation.
15    Q.   You mean --
16    A.   -- passports that expired, so on and so
17 forth.
18    Q.   Okay.
19    A.   The airline would get fined.
20    Q.   By FAA?
21    A.   Correct.  By whichever government agency
22 it was at the time, and the fines would come through
23 our office.
24    Q.   Did you actually deal with any government
25 agencies as a result of that?

One Penn Plaza, NYC                     Toby Feldman, Inc.                tel (212) 244.3990
email@tobyfeldman.com       NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS       tel (800) 246.4950

Ester Lorusso                                              12/19/2007

Page 166

LORUSSO

1
2     A.   No.
3     Q.   You mean they just were processed through
4   your office?
5     A.   Correct. So we would see what they were
6   regarding and so on and so forth.
7     Q.   So this is your experience with
8   Immigration?
9     A.   Right.
10    Q.   What about with the FAA? Did you have any
11  experience with them?
12    A.   No.
13    Q.   Did Mr. Massimillo ever tell you he
14  thought you were qualified for VP of regulatory
15  affairs?
16    A.   Yes.
17    Q.   He said so?
18    A.   Yes.
19    Q.   He doesn't appear on any list that you've
20  given us of potential witnesses.
21    A.   Can I clarify that a bit?
22    Q.   Okay. I think you better. Go ahead.
23    A.   In regards to Dursun getting the job, I
24  was qualified to getting the position.
25    Q.   Meaning, you weren't necessarily qualified

Page 167

LORUSSO

1   but you were better qualified than Dursun?
2     A.   That is correct.
3     Q.   Your basis for saying that is your work in
4   customer relations?
5     A.   Yes.
6     Q.   And your fluency in English?
7     A.   Yes.
8     Q.   Anything else?
9     A.   I had gone through a crisis management
10  course --
11    Q.   Okay.
12    A.   -- a few years ago.
13    Q.   Did you ever discuss Dursun Oxsus's
14  appointment with Orlando D'Oro?
15    A.   Yes.
16    Q.   When did you do that?
17    A.   I don't recall.
18    Q.   Was it around the time that Dursun Oksus
19  was appointed?
20    A.   Yes.
21    Q.   What did Mr. D'Oro say?
22    A.   He was in disbelief that Dursun got the
23  position.
24    Q.   Did he give any reason for his disbelief?

Page 168

LORUSSO

1
2     A.   Yes. He believed he was incompetent.
3     Q.   How many conversations with Orlando did
4   you have about Dursun Oxsus's appointment?
5     A.   I don't recall.
6     Q.   Orlando had been the vice president of
7   regulatory affairs, correct?
8     A.   No.
9     Q.   He had been the director of regulatory
10  affairs?
11    A.   I'm sorry. Yes, he was the VP.
12    Q.   He was the VP?
13    A.   Yes, I'm sorry.
14    Q.   And then he took the early retirement
15  package at some point?
16    A.   Yes. To the best of my knowledge, yes.
17    Q.   And that's how the vacancy was created for
18  Dursun Oksus to get appointed?
19    A.   That's correct.
20    Q.   But didn't Mr. D'Oro stay on as a
21  consultant?
22    A.   Yes, he did.
23    Q.   Did Mr. D'Oro mention that he was supposed
24  to be training Mr. Oksus?
25    A.   Yes, he did.

Page 169

LORUSSO

1
2     Q.   Did he feel that Dursun Oksus was capable
3   of being trained?
4     A.   No.
5     Q.   He said so?
6     A.   I believe so.
7     Q.   You are sure?
8     A.   I'm not sure.
9     Q.   So Dursun Oxsus's knowledge about his own
10  qualifications are that he got hired and that
11  everyone else thought he was incompetent. Is that a
12  fair summary?
13        MS. KURZON:  Objection. I don't --
14        MR. KORAL:  You're right. I'll withdraw
15  that.
16    Q.   What does Dursun Oksus know about his
17  qualifications for vice president that you haven't
18  already testified to?
19        MS. KURZON:  Objection. I don't
20  understand. You are asking her to speak to
21  what Dursun Oksus believes to be his own
22  qualifications?
23        MR. KORAL:  He was listed as somebody with
24  knowledge and information. Yes, I am.
25        What knowledge and information do you all

43 (Pages 166 to 169)

Ester Lorusso                                                  12/19/2007

Page 190

LORUSSO
1
2     A.  No, not my notes.  Perhaps your notes.
3     Q.  Oh, we've given you what we have.
4         You think that Mr. -- somebody told you,
5  you don't remember who, that Mr. Pausini changed the
6  review?
7     A.  Yes.  I believe he came to New York to do
8  it.
9     Q.  He came to New York to change the review?
10    A.  Yes.  One of the reasons why he was in New
11  York.
12    Q.  Because he had already been transferred
13  back to Rome?
14    A.  Yes.
15    Q.  And Mr. Libutti was in charge here,
16  correct?
17    A.  Yes.
18    Q.  Paragraph 18 says that "Mr. Libutti was
19  immediately dismissive of plaintiff."
20        In what ways was Mr. Libutti dismissive of
21  you immediately?
22    A.  He basically wanted to know about our
23  advertising practices and made it clear to me that
24  that wasn't the way things should be done.
25    Q.  Okay.  Can you think of any specific

Page 191

LORUSSO
1
2  examples where he didn't like the way things were
3  being done?
4     A.  I can't think of anything specific right
5  now.
6     Q.  Did Mr. Libutti continue during the time
7  he remained as director in marketing in the
8  Passenger Division that he didn't like the way the
9  advertising was being done?
10    A.  Excuse me?
11    Q.  Did Mr. Libutti continue to make it clear
12  to you that he didn't like the way the advertising
13  was being done as long as you remained in Passenger?
14    A.  Mr. Libutti was negative about anything
15  that had to do with me, so it's hard to pinpoint
16  whether he continued or he didn't continue.
17    Q.  Did he continue, for example, to criticize
18  the advertising?
19    A.  He didn't continue to criticize the
20  advertising.  He would continue to criticize
21  anything I had to do.
22    Q.  Well, advertising was a big --
23    A.  With the advertising.
24    Q.  Advertising was a big part of what you
25  did, correct?

Page 192

LORUSSO
1
2     A.  Yes.
3     Q.  So he didn't criticize the advertising --
4     A.  In other words, he came to the States and
5  said, This is the way we used to do it in Argentina.
6  This is the way it should be done.  This is the way
7  we did it in Argentina.
8     Q.  Did you change the way you were doing
9  things to conform to what Mr. Libutti wanted?
10    A.  I think I tried to appease him with
11  certain things, yes.
12    Q.  With certain things?
13    A.  Yes.
14    Q.  But he continued to feel that he wanted it
15  done differently?
16    A.  Yes.
17    Q.  Paragraph 18 continues, "He made it clear
18  that women" -- clear to you, I'm sorry -- "that
19  women were not meant to serve in executive
20  capacities."
21        How did he do that?
22    A.  By taking parts of my job away and giving
23  them to Tim O'Neill.
24    Q.  What parts were those?
25    A.  Yearly sales meeting.

Page 193

LORUSSO
1
2     Q.  You used to run a yearly sales meeting?
3     A.  The organization of the yearly sales
4  meeting, yes.
5     Q.  You organized it?
6     A.  Yes.
7     Q.  Whom did he give that to?
8     A.  Tim O'Neill.
9     Q.  Who?
10    A.  Tim O'Neill.
11    Q.  Tim O'Neill, who was in sales?
12    A.  Who was a fellow director.
13    Q.  Tim O'Neill's title was sales and
14  alliance --
15    A.  -- coordination.
16    Q.  -- coordination?
17    A.  That's correct.
18    Q.  The alliance referred to, by the way, just
19  so we were clear, that's the Sky Team alliance with
20  Delta and other airlines?
21    A.  That's correct.
22    Q.  Air France, I think.
23        Other than taking some of your
24  responsibilities away, such as the yearly sales
25  meeting, how else did he make it clear to you that

49 (Pages 190 to 193)

Ester Lorusso                                                      12/19/2007

Page 194

LORUSSO

1     LORUSSO
2     women didn't belong in executive positions?
3         A.   By giving me menial tasks.
4         Q.   Mr. Libutti gave you menial tasks?
5         A.   Yes.
6         Q.   Such as?
7         A.   I recall one day he came in with shopping
8     bags full of his home videos that he wanted
9     transferred to DVDs.
10        Q.   Yes?
11        A.   And he handed them to me so that I could
12    get them done for him.
13        Q.   So that you could get them done for him
14    where?
15        A.   At our ad agency.
16        Q.   So it was the ad agency would did that,
17    correct?
18        A.   They expected them to do that.
19        Q.   He didn't ask you to do it.
20        A.   He asked me to ask them to do it.
21        Q.   And you were the liaison to the ad agency.
22    Wasn't that your principal job?
23        A.   Yes.  At no cost, I might add.
24        Q.   Okay.  The ad agency refused?
25        A.   I don't know what happened because I gave

Page 195

LORUSSO

1     the bag -- I felt that I was in a compromising
2     position because I was the liaison to the ad agency.
3     So I handed the shopping bags to his secretary, to
4     his assistant, and I asked her to follow up on it.
5         Q.   You told her to follow up on it?
6         A.   I asked her to.
7         Q.   You didn't do what Mr. Libutti asked, you
8     told his secretary to do what Mr. Libutti asked?
9         A.   Mr. Libutti was asking me to do something
10    that was personal in nature and not business
11    oriented and he was asking me to do it without being
12    charged.  So I really felt that it would be
13    compromising my position as the liaison between the
14    agency and Alitalia.
15        Q.   Did you tell that to Mr. Libutti's
16    secretary?
17        A.   What do you mean?
18        Q.   Did you say to her, You better do this
19    because I feel my position would be compromised if I
20    give this to the ad agency?
21        A.   I believe I did.
22        Q.   Did you say it to Mr. Libutti?
23        A.   I don't recall.
24        Q.   Going back to ways in which he made it

Page 196

LORUSSO

1     clear to you that women were not meant to serve in
2     executive capacities.  You said, one, he transferred
3     responsibilities away from you, one of it was the
4     sales meeting.  What else?
5         A.   We had a yearly symposium which my
6     department organized.  He also gave that to Tim
7     O'Neill.
8         Q.   Who in your department did the organizing
9     of that?
10        A.   Elizabeth Santella.
11        Q.   Elizabeth Santella?
12        A.   Yes.
13        Q.   What was her title at the time?
14        A.   I believe it was sales promotion manager.
15        Q.   Did Elizabeth --
16        A.   -- or marketing communications manager.  I
17    don't recall at the time.
18        Q.   Did he transfer Elizabeth Santella to
19    report to Tim O'Neill at that time?
20        A.   No.
21        Q.   What else did he take away from you?
22        A.   The marketing component of the sales team
23    alliance.  I used to handle that and then he wanted
24    Tim O'Neill to handle that.

Page 197

LORUSSO

1         Q.   When you say, "the sales team," you mean
2     the Sky Team alliance?
3         A.   I'm sorry, the Sky Team alliance.
4         Q.   So Tim started handling the marketing
5     component of Sky Team?
6         A.   Yes.
7         Q.   How much of your job did that involve?
8         A.   I would say about 15 percent.
9         Q.   Anything else you can think of that was
10    transferred?
11        A.   No, but I did write to Libutti all of the
12    items that he was -- that concerned us.
13        Q.   Okay.  You complained about this to
14    Libutti?
15        A.   Yes, I did.
16        Q.   What's your basis for thinking it was
17    because you're a woman that he transferred these
18    things to Tim O'Neill?  Do you have a basis for it?
19        A.   I was the only woman, female director.
20        Q.   Any other reason?
21        A.   Probably that's because Libutti came with
22    the reputation of, you know, treating women as --
23    not treating women well.
24        Q.   He came with that reputation?

50 (Pages 194 to 197)

Ester Lorusso                                                    12/19/2007

Page 202

```
 1              LORUSSO
 2   passed on to us?
 3       A.  Yes, of course.
 4       MS. KURZON:  Or notes that you reviewed
 5   because they've been produced by Alitalia?
 6       THE WITNESS:  Of course.
 7       Q.  In paragraph 20 you say that he "shifted
 8   duties to a less experienced male colleague."
 9           Who was that?  Was that Tim O'Neill?
10       A.  Yes, it is.
11       Q.  Less experienced in what way?
12       A.  In marketing.
13       Q.  What's Tim O'Neill's background?  Sales?
14       A.  Yes.
15       Q.  Tim O'Neill is approximately your age or a
16   little older?
17       A.  A little older.
18       Q.  Do you know if he came to the travel
19   industry, the airline industry late in life?
20       A.  No.
21       Q.  As far as you know, that's what he's
22   always done?
23       A.  Yes.
24       Q.  What tasks were given to Francesca Forte
25   as alleged in paragraph 22?
```

Page 203

```
 1              LORUSSO
 2       A.  Francesca Forte was given the
 3   responsibility of advertising.
 4       Q.  Francesca Forte got the responsibilities
 5   of advertising?
 6       A.  Yes.
 7       Q.  What was her position prior to your
 8   transfer to GA2000?
 9       A.  I don't remember her title, but she
10   reported to me.
11       Q.  Was she a manager?
12       A.  No.
13       Q.  She was an administrative assistant?
14       A.  I think her title had representative in
15   it, the word "representative."
16       Q.  And she got the same responsibilities for
17   advertising that you had had?
18       A.  Yes, she did.  My work was split up.
19       Q.  Isn't it true that advertising was moved
20   to Rome at this time, in 2004?
21       A.  Actually, it was supposed to have been
22   moved to Rome, but I believe that first Francesca
23   Forte was working on it in New York and then she was
24   transferred along with the responsibility.  She was
25   transferred to Rome.
```

Page 204

```
 1              LORUSSO
 2       Q.  Do you know when that occurred?
 3       A.  I don't remember at this time.
 4       Q.  Were you still at GA2000 when she was
 5   transferred to Rome?
 6       A.  I believe so.
 7       Q.  Had you just begun in GA2000 when she was
 8   transferred to Rome?
 9       A.  I don't remember.
10       Q.  And, as you said, they split up your
11   responsibilities and gave them to different people?
12       A.  Yes.
13       Q.  Anybody besides Tim O'Neill and Francesca
14   Forte?
15       A.  I believe Lisa Del Percio was doing a few
16   things, and she was --
17       Q.  Lisa, L-I-S-A?
18       A.  Yes.
19       Q.  Del Persio.
20           Do you recall anything specific that Lisa
21   was doing that you had done?
22       A.  That my department had done?  She was
23   handling barter, promotional barter.
24       Q.  Was she a manager?
25       A.  No.
```

Page 205

```
 1              LORUSSO
 2       Q.  Had she been doing that before you went to
 3   GA2000, under your supervision, I mean?
 4       A.  No, no.  She reported directly to Libutti.
 5   She was his assistant.
 6       Q.  She was this assistant?
 7       A.  Yes.
 8       Q.  His administrative assistant?
 9       A.  Yes.
10       Q.  So she got the administrative barter --
11   pardon me, the promotional barter?
12       A.  Yes.
13       Q.  Can you think of anybody else that got
14   some of your responsibilities?
15       A.  Not at this time.
16       Q.  Paragraph 24 states that you knew that
17   GA2000 would soon close.  Your testimony earlier was
18   that you were concerned that it might close because
19   Alitalia was closing subsidiaries.
20           Did you have any specific knowledge that
21   it would close or does "knew" here mean really
22   suspected?
23       A.  I suspected.
24       Q.  You feared it?
25       A.  I feared it.
```

One Penn Plaza, NYC                    Toby Feldman, Inc.                    tel (212) 244.3990
email@tobyfeldman.com        NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS        tel (800) 246.4950

Ester Lorusso                                                    12/19/2007

Page 206

LORUSSO

1
2     Q.   Twenty-eight states, "In or around the
3     summer of 2005, Mr. Libutti announced that the
4     company intended to rejuvenate the New York office
5     and get rid of the 'old faces.'"
6          You say "announced." Was this at a
7     meeting?
8     A.   I don't recall.
9     Q.   Was this the statement that Mr. Mariotti
10    reported to you or are you thinking of something
11    specific? Something else, I mean.
12    A.   I believe it was the statement that
13    Mariotti reported to me.
14    Q.   So you never heard Libutti say this?
15    A.   No.
16    Q.   Paragraph 30 states that in October of
17    2005 you again complained of age and gender
18    discrimination.
19         To whom did you make that complaint?
20    A.   I don't recall.
21    Q.   Do you recall whether it was in writing?
22    A.   I think I did put it in writing.
23    Q.   All right. I haven't seen -- I'll just
24    represent to you I have not seen anything in writing
25    between 2004 and, let's say, 2006. I haven't seen

Page 207

LORUSSO

1
2     an October 2005 complaint.
3          I just wonder, do you remember whether it
4     was in writing?
5     A.   No. I don't remember.
6          I believe that October 2005 was when I was
7     told that GA2000 was closing, therefore I, most
8     probably, said at that time to Libutti and Gallo
9     that this was done on purpose.
10    Q.   You don't have a specific recollection of
11    saying that to Libutti and Gallo?
12    A.   Yes. I did say it to them.
13    Q.   You have a specific recollection?
14    A.   I have a specific recollection.
15    Q.   Can you remember where that was said?
16    A.   It must have been in Libutti's office. I
17    am not certain.
18    Q.   You don't recollect that?
19    A.   I don't recollect that.
20    Q.   But you recollect saying it?
21    A.   Yes.
22    Q.   Do you recollect what reaction you got
23    from either one of them?
24    A.   No. I don't recollect.
25    Q.   You don't recall if either of them said

Page 208

LORUSSO

1
2     anything, or, if so, what they said?
3     A.   Right.
4     Q.   Now, when GA2000 was closed, what happened
5     to the employees of GA2000?
6     A.   We let them go.
7     Q.   They were all terminated?
8     A.   They were all terminated.
9     Q.   What kind of severance did they get?
10    A.   Two weeks' salary.
11    Q.   Two weeks' salary, period?
12    A.   Yes.
13    Q.   And the only exceptions to that were
14    yourself, who was kept on, although you may not have
15    had responsibilities to perform, and Mr. Farrow who
16    took early retirement?
17    A.   Right. And the two of us were employed by
18    Alitalia and all the employees that terminated
19    were employed by GA2000.
20    Q.   Those employees were quite young, weren't
21    they, for the most part?
22    A.   The GA2000 employees?
23    Q.   Yes.
24    A.   It was mixed.
25    Q.   Mixed?

Page 209

LORUSSO

1
2     A.   I think so.
3     Q.   They weren't mostly young, relatively
4     low-paid employees?
5     A.   They were low-paid employees and most of
6     them were hired through a temp agency.
7     Q.   You didn't do the hiring. They were in
8     place when you got there, correct?
9     A.   Most of them, yes.
10    Q.   Who was your predecessor as general
11    manager of GA2000?
12    A.   Jean-Paul.
13    Q.   Say it again.
14    A.   Jean-Paul. I don't know how to spell his
15    last name.
16    Q.   J-E-A-N, hyphen, P-A-U-L?
17    A.   Correct.
18    Q.   French name?
19    A.   Yes, or Belgian, I believe he was.
20    Q.   Can you pronounce his last name?
21    A.   Steurve, S-T-E-U-R-V-E. Something like
22    that.
23    Q.   He was general manager of GA2000 before
24    you took over?
25    A.   I don't know if that was his exact title,

53 (Pages 206 to 209)

Ester Lorusso                                              12/19/2007

Page 210

LORUSSO
1
2    but he was my predecessor.
3        Q.  Do you have any idea what your salary was
4    compared to his?
5        A.  No, I don't.
6        Q.  Do you know why he left the job?
7        A.  No, I don't.
8        Q.  Did he stay with the company, do you know,
9    or did they transfer him somewhere else, or you
10   don't know what happened to him at all?
11       A.  No.  I believe he left the company.
12       Q.  Do you know if he was fired?
13       A.  I don't know the circumstances of his
14   leaving.
15       Q.  Now, when you were general manager of
16   GA2000, who was your boss?
17       A.  That's a good question.
18       Q.  Thank you.  Do you have any idea who your
19   boss was?
20       A.  Indirectly, Libutti, and directly,
21   Francesco Gallo.
22       Q.  Gallo was nominally president of GA2000?
23       A.  That's correct.
24       Q.  But he didn't have an office over there?
25   He didn't --

Page 211

LORUSSO
1
2        A.  No.
3        Q.  Did Gallo, in fact, supervise you while
4    you were there?
5        A.  Yes.
6        Q.  Did he give you any evaluations?
7        A.  No.
8        Q.  In what ways did he supervise you?
9        A.  He signed my vacation slips.
10       Q.  That was it, pretty much?  Well, if you
11   wanted to fire somebody -- I think you testified
12   that you fired a couple of people -- did you get
13   Gallo's permission or did you just do it and
14   informed him?
15       A.  I believe I informed him of what I wanted
16   to do because what I found when I got to the company
17   was a lot of employees had very low salaries rather
18   than more quality employees at a bit higher salary.
19       So that's about the only adjustment I made
20   as far as the number of employees is concerned.
21       Q.  But you say you made the adjustments, he
22   didn't make the adjustments?
23       A.  That's correct.
24       Q.  But he approved them or at least was kept
25   informed of them?

Page 212

LORUSSO
1
2        A.  That's correct.
3        Q.  Which one was it?  I shouldn't have asked
4    the question that way.
5        A.  He approved.
6        Q.  Formally or just informally?
7        A.  Informally.
8        Q.  You would tell him and he would say, yes,
9    good idea --
10       A.  Yes.
11       Q.  -- that sort of thing?
12       Now 31 says you were placed alone on an
13   empty floor in the Empire State Building.
14       Was there really nobody else on the 36th
15   floor besides yourself after GA2000 closed?
16       A.  I was eventually alone and it was
17   step-by-step.  I don't recall at one point when the
18   other offices closed.
19       Q.  GA2000 closed I think at the end of
20   October 2005.
21       A.  Yes.
22       Q.  And so for November, December, January,
23   February and March you were on 36 the whole time?
24       A.  Yes.
25       Q.  You didn't get moved to 37 at any point in

Page 213

LORUSSO
1
2    that time?
3        A.  That's correct.
4        Q.  And then in April you started in Cargo,
5    and we'll get to that later.
6        In November, weren't there other people on
7    36?
8        A.  I can't recall if the ticket office was
9    still open at the time.
10       Q.  The ticket office was on 36, wasn't it?
11       A.  Yes, it was.
12       Q.  Of course they were out in the open,
13   correct?
14       A.  No.  They were in a separate office,
15   totally, on the 36th floor.
16       Q.  A separate office with a separate door?
17       A.  Yes.
18       Q.  And you had your own office?
19       A.  GA2000?
20       Q.  Yes.
21       A.  Yes.
22       Q.  And it said GA2000 on the door?
23       A.  That's correct.
24       Q.  And those people all moved out and Farrow
25   retired and you were left alone in the GA2000

One Penn Plaza, NYC                    Toby Feldman, Inc.                    tel (212) 244.3990
email@tobyfeldman.com        NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS        tel (800) 246.4950

Page 214

LORUSSO

1
2  office?
3      A.  Right.
4      Q.  At some point the ticketing office closed?
5      A.  Yes.
6      Q.  But you don't know when?
7      A.  I don't know when. I don't recall.
8      Q.  All right. You write here that Gallo
9  found you -- that's 32 -- a position as director of
10  marketing and communications in Cargo.
11          How do you know that it was Gallo that did
12  that?
13      A.  He communicated it to me in January.
14      Q.  Do you know whether Walter Longo had
15  approved it?
16      A.  I don't know.
17      Q.  Do you know whether Libutti instructed
18  Gallo to find that job for you?
19      A.  I don't know.
20      Q.  All you know is that Gallo is the one that
21  told you we've got you a job in Cargo?
22      A.  Correct.
23      Q.  I think you've already testified about
24  your effort to -- your attempt to apply for the
25  regulatory affairs position?

Page 215

LORUSSO

1
2      A.  Yes.
3      Q.  So we don't have to discuss that.
4          Are you sure that it was director of
5  regulatory affairs in February of 2006? That's
6  paragraph 38. Mr. Oksus got the job around then as
7  vice president, didn't he?
8      A.  I don't recall.
9      Q.  Who was it who told on November 7, 2006
10  that you'd have to interview for the director of
11  regulatory affairs job? That's paragraph 40.
12      A.  I believe it was Mr. Porru.
13      Q.  P-O-R-R-U. He's in the room.
14          Did he, in fact, interview you?
15      A.  Yes.
16      Q.  What do you recall about the interview?
17      A.  It seemed to have gone well.
18      Q.  Sorry?
19      A.  It seemed to have gone well.
20      Q.  What do you recall about it other than
21  your general impression that it went well?
22      A.  That's all I recall about it.
23      Q.  Do you recall discussing your experience
24  and qualifications in regulatory affairs?
25      A.  Yes.

Page 216

LORUSSO

1
2      Q.  And you told Mr. Porru that you felt that
3  your customer service experience gave you
4  qualification?
5      A.  That's correct.
6      Q.  Did he say anything?
7      A.  Pardon me?
8      Q.  Did he comment on that?
9      A.  I don't recall.
10      Q.  You've already testified you don't know
11  whether that position was ever filled.
12      A.  Correct.
13      Q.  But it wasn't filled by you in any case?
14      A.  No, it wasn't.
15      Q.  Did you ever contact Mr. Porru again about
16  that position?
17      A.  I don't remember.
18      Q.  By the way, isn't the IT office still on
19  the 36th floor?
20      A.  I don't know.
21      Q.  You don't know whether the IT office --
22  wasn't it on the 36th floor the entire time you were
23  on the 36th floor?
24      A.  Yes. On the other side of the building.
25      Q.  But it was there?

Page 217

LORUSSO

1
2      A.  Yes.
3      Q.  Do you know any of the people in IT?
4      A.  A few.
5      Q.  Paragraph 44 is referring to the positions
6  we've already discussed in paragraph 33, namely
7  Lucia Alla's position and the position that went to
8  Nicola Arnese.
9          It says, "These position went to younger
10  and inexperienced workers while plaintiff was not
11  even allowed to interview for these positions."
12          First, Lucia Alla is not younger than you,
13  is she?
14      A.  No. She is not.
15      Q.  Nicola Arnese is?
16      A.  Yes, he is.
17      Q.  Lucia Alla is not an inexperienced worker,
18  correct?
19      A.  No, she is not.
20      Q.  Do you know what experience Mr. Arnese
21  has?
22      A.  Let me go back to that. Inexperienced as
23  far as what the position entailed. Lucia Alla had
24  never handled customer relations before. That was a
25  huge component of the position.

55 (Pages 214 to 217)

Ester Lorusso                                                  12/19/2007

Page 218

LORUSSO

1
2    Q.  Now, you said that you were -- first let
3    me say, Mr. Arnese, do you know anything about his
4    experience?
5    A.  I think he was with the company for about
6    a year and-a-half.  He was about 33 years old and
7    came from a different country to the United States
8    for the first time to work.
9    Q.  Do you know whether he worked for
10   Lufthansa at any point in his career?
11   A.  I don't know.
12   Q.  Do you know whether he worked for any
13   other airline before he came to Alitalia?
14   A.  No.
15   Q.  Do you know what he did for Alitalia
16   during his year and-a-half with Alitalia in Europe
17   before he came to the U.S.?
18   A.  No.  But this is basically along the same
19   line as the questions you were asking me concerning
20   Dursun.  In comparison I believe I had stronger
21   qualifications.
22   Q.  But you don't know what his qualifications
23   were you just testified.
24   A.  Well --
25   Q.  The record will reflect whatever you

Page 219

LORUSSO

1
2    testified about.  That wasn't the question.
3    A.  Okay.
4    Q.  Although it wasn't objected to.
5    Let me ask you this:  You say that you
6    were not even allowed to interview for those
7    positions?
8    A.  I wasn't give the opportunity.
9    Q.  Did you ask to?
10   A.  I didn't even know they were available.
11   Q.  You knew Marqueza had quit, didn't you?
12   A.  Who?
13   Q.  You knew Marqueza had quit.
14   A.  I don't think he had anything to do with
15   these positions.
16   Q.  Lucia Alla took Marqueza's position.
17   A.  No, Gabriele Mariotti.
18   Q.  I'm sorry.  What did I say?  Marqueza?
19   Oh, that's much later.  Sorry, I had the names
20   confused.
21   You knew that Mariotti had quit, didn't
22   you?
23   A.  Yes, I did.
24   Q.  Did you ask about getting Mariotti's
25   position?

Page 220

LORUSSO

1
2    A.  I think the timing was so short that I
3    didn't even get a chance to.
4    Q.  Really?
5    A.  Yes.
6    Q.  You think that Lucia Alla was appointed to
7    that Mariotti position within a matter of days?
8    A.  Yes.
9    Q.  Did you protest about that?
10   A.  I don't believe I did.
11   Q.  Whom did Mr. Arnese replace?
12   A.  He replaced Marco D'Ilario.
13   Q.  What happened to Mr. D'Ilario?
14   A.  I believe he went back to Rome.
15   Q.  All right.  How long was that position
16   vacant, if you know, between the time Mr. D'Ilario
17   left and when Mr. Marqueza came?
18   A.  I don't know.
19   Q.  Did you know that Mr. D'Ilario had left?
20   I mean, when Mr. D'Ilario had left you knew that his
21   job was open, correct?
22   A.  Yes, I believe so.
23   Q.  Did you talk to anybody about filling that
24   job?
25   A.  No.

Page 221

LORUSSO

1
2    Q.  Okay.  We will move on from the complaint.
3    The next document that we will look at is
4    Defendant's Exhibit 4.  It's your EEOC charge.
5    (Defendant's Exhibit 4, EEOC charge, was
6    marked for identification as of this date.)
7    Q.  I'm going to ask you, first, Ms. Lorusso,
8    have you seen this document before?
9    A.  Yes.
10   Q.  Is that your signature on the page that's
11   stamped 0008?
12   A.  I'm sorry?
13   Q.  Is that your signature on page 8?
14   A.  Yes, it is.
15   Q.  Did you swear to the truth of this on the
16   24th of January 2007?
17   A.  Yes, I did.
18   Q.  Did you write this yourself?
19   A.  Yes, I did.
20   Q.  And you gave it to Mr. Behrins?
21   A.  Yes, I did.
22   Q.  And he notarized it for you?
23   A.  Yes, he did.
24   Q.  Did you understand that you were filing a
25   charge of discrimination with EEOC?

One Penn Plaza, NYC                    Toby Feldman, Inc.                    tel (212) 244.3990
email@tobyfeldman.com          NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS       tel (800) 246.4950

Page 234

LORUSSO

1  work. I think you testified that was the
2  advertising.
3
4      A.  Yes.
5      Q.  Do you know if Francesca Forte ever ran an
6  advertising campaign?
7          MS. KURZON:  Prior to being given --
8          MR. KORAL:  No.
9      Q.  After being given these responsibilities,
10  did she ever run an advertising campaign?
11      A.  I don't know.
12      Q.  Wasn't all advertising at that point being
13  done in Rome?  And by "done" I mean created and
14  handled by Rome.
15      A.  I don't know.
16      Q.  I think you already testified that she was
17  transferred to Rome eventually.
18      A.  Yes.
19      Q.  Sometime after the summer of 2005?
20      A.  I don't recall.
21      Q.  When Francesca Forte reported to you, what
22  did she do?  What were her responsibilities?
23          I know you said you don't remember her
24  title.  Do you remember what her responsibilities
25  were?

Page 235

LORUSSO

1
2      A.  A lot of the work that Elizabeth and
3  Francesca did overlapped, so I don't remember
4  specifically what Francesca was doing.
5      Q.  That's Elizabeth Santella?
6      A.  Yes.
7      Q.  Did it have something to do with
8  advertising?
9      A.  Yes.
10      Q.  To whom did Francesca report after you
11  went to GA2000?
12      A.  To Guilio Libutti.
13      Q.  She reported directly to Guilio?
14      A.  I believe so.
15      Q.  Who, if anybody, until the summer of 2005,
16  was handling advertising?  Was Mr. Libutti doing
17  that himself?
18      A.  I don't remember.
19      Q.  Okay.  You state at the top of page 5 that
20  you had several meetings with Gallo and Libutti
21  about a possible severance package.
22          Who initiated those conversations?
23      A.  I don't recall.
24      Q.  You state that Mr. Libutti offered you two
25  years' salary, lifetime airline ticket benefits and

Page 236

LORUSSO

1
2  medical benefits, but that you rejected the offer.
3          My first question is:  Did he make this
4  offer in writing?
5      A.  No.
6      Q.  Were any of these negotiations I'll call
7  them about possible severance package done in
8  writing?
9      A.  No.
10      Q.  So these were all just conversations with
11  Libutti and Gallo?
12      A.  Correct.
13      Q.  But it was Libutti who offered the two
14  years?
15      A.  Yes.
16      Q.  Did he offer it to you as a solid offer or
17  did he say he would try to get it for you?
18      A.  I don't recall.
19      Q.  You say you rejected the offer because you
20  wanted to continue working; is that right?
21      A.  Yes, sir.
22      Q.  Now, you had already been looking for jobs
23  according to this.
24      A.  Yes.
25      Q.  And you had not been coming up with any?

Page 237

LORUSSO

1
2      A.  No.
3      Q.  Because of your age and your level?
4      A.  I believe so.
5      Q.  Did the headhunters tell you that?
6      A.  No.
7      Q.  They did not say, Oh, you're too old to
8  get a job.  You've got to stay where you are, alone
9  on the 36th floor.
10          They did not say something like that?
11      A.  No.  Not that I recall.
12      Q.  Once you were in Cargo, what were your
13  activities?  What jobs, tasks did you perform?
14      A.  It wasn't clear.
15      Q.  Okay.  It states here, third paragraph
16  from the bottom on page 5 you began working on an
17  e-mail database.
18          Was that assigned to you?
19      A.  No.  It was not.
20      Q.  It was something that you saw a need for
21  and decided to develop?
22      A.  That is correct.
23      Q.  In fact, it was to be a Cargo contacts
24  directory, wasn't it?  Wasn't that what you
25  envisioned?

One Penn Plaza, NYC                    Toby Feldman, Inc.                    tel (212) 244.3990
email@tobyfeldman.com        NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS        tel (800) 246.4950

Ester Lorusso                                                    12/19/2007

Page 238

LORUSSO
1
2     A.  Clients directory.  Yes, a client
3  database.
4     Q.  And you distributed drafts of it at
5  different time to various managers and directors in
6  Cargo and asked them for input?
7     A.  Yes.
8     Q.  And you got that input from them?
9     A.  Yes.
10     Q.  You also put together newsletters?
11     A.  Yes.
12     Q.  And also, didn't you develop fliers?
13     A.  Yes, I did.
14     Q.  Didn't you get a lot of very positive
15  feedback about the fliers you developed?
16     A.  Yes, I did.
17     Q.  Certainly from Canada, in any event, and
18  Chicago?
19     A.  I believe so.
20     Q.  So you weren't without things to do,
21  although some of these were things that you
22  developed yourself such as the idea for the
23  database, correct?
24     A.  That is correct.
25     Q.  You state that Mr. DiFeo was given a

Page 239

LORUSSO
1
2  yearly stipend of approximately $60,000 for his
3  apartment.  How did you know that?
4     A.  I don't remember.  I don't recall.
5     Q.  Are you aware that Mr. DiFeo is an
6  ex-patriot?
7     A.  Yes.
8     Q.  And you know that ex-patriot compensation
9  is very different from a local national
10  compensation?
11     A.  Yes.
12     Q.  Ex-patriots often get living allowance and
13  schooling allowances and taxes grossed up and all
14  that stuff.  Are you aware of that?
15     A.  Yes, I am.
16     Q.  How do you know that Mr. DiFeo's salary
17  was $95,000?
18     A.  I don't recall.
19     Q.  Do you know for a fact that it is or
20  you're not really sure?
21        MS. KURZON:  Objection.
22     Q.  Do you know for a fact that his salary was
23  $95,000?
24     A.  No.  I don't know for a fact.
25     Q.  Did you ever discuss Mr. DiFeo's

Page 240

LORUSSO
1
2  compensation with Mr. Gallo?
3     A.  No.  I did not.
4     Q.  Let's take a look at page 6, the second
5  full paragraph.  This deals with Mr. Mariotti.  Mr.
6  Mariotti had been pricing director, it says, and
7  then in May he became director sales and marketing
8  coordination, Passenger Division, and he got the
9  customer relations department.
10        So at this point in time Mr. Mariotti had
11  pricing, he had customer relations.  He also had
12  sales coordination and the alliance, didn't he?
13     A.  I don't recall.  I do remember him having
14  pricing and customer relations.
15     Q.  How about sales coordination?
16     A.  I don't recall.
17     Q.  His title is director sales and marketing
18  coordination, Passenger Division?
19     A.  Right.
20     Q.  Did he ever tell you that he had — what
21  his responsibilities were?
22     A.  I knew his responsibilities as pricing
23  director and marketing.  I wasn't quite clear on the
24  sales coordination part.
25     Q.  Marketing coordination, correct?

Page 241

LORUSSO
1
2     A.  Right.
3     Q.  In Passenger?
4     A.  Right.
5     Q.  You weren't really interacting with him in
6  business because you were in Cargo and there was no
7  real need to interact with Mr. Mariotti except on a
8  friendly level; is that correct?
9     A.  That's correct.
10     Q.  Are you aware that Lucia Alla now is
11  responsible for pricing?
12     A.  Yes.
13     Q.  And that she is responsible for sales
14  coordination?
15     A.  If that's her title, then yes.
16     Q.  I'm not representing what her title is.
17     A.  Okay.
18     Q.  Also, she is responsible for customer
19  relations, correct?
20     A.  I am aware that she took Gabriele
21  Mariotti's position.
22     Q.  Okay.  And you didn't hear anything to
23  suggest that she didn't get all of it.  She is doing
24  basically what Mariotti was doing?
25     A.  Correct.

61 (Pages 238 to 241)

Page 242

LORUSSO

1
2      Q.   Do you know that she is doing alliance as
3  well?
4      A.   No.
5      Q.   Okay.  In the next paragraph, just so we
6  clarify this, the third one down, the last sentence.
7  "I was the only employee in an office on the 36th
8  floor."
9           Do you mean you were the only employee
10  left in the GA2000 office?  Is that what you mean?
11      A.   That's correct.
12      Q.   Because there certainly were other
13  employees on the 36th floor in offices?
14      A.   Very few.
15      Q.   Well, there was IT?
16      A.   There were about three people in IT.  And
17  as I said, I don't remember when the ticket office
18  closed.
19      Q.   How many were there before it closed, do
20  you know?
21      A.   In the ticket office?
22      Q.   Yes.  Was it a half dozen people?
23      A.   It would be eight, maybe.
24      Q.   The ticket people had like cubicles in
25  their office?

Page 243

LORUSSO

1
2      A.   It was a ticket office that was open to
3  the public so it was -- imagine a ticket office, not
4  really cubicled.
5      Q.   Desks, sort of an open desk kind of area?
6      A.   That's correct.
7      Q.   The next paragraph says that Paul Baxtrum
8  sent you an e-mail asking you to update the Cargo
9  phone directory.
10          Do you still have that e-mail?  Is that
11  one of the documents you believe you produced,
12  because I don't believe I've seen it although I
13  won't swear I haven't seen it.
14      A.   No, I don't.
15      Q.   You don't recall whether you've seen it
16  recently in preparation, say, for today's
17  deposition?
18      A.   I don't recall if it was in the batch of
19  papers that I handed over last week.
20      Q.   Do you know, by the way, whether Paul
21  Baxtrum is still working for Alitalia?
22      A.   I heard that he had left.
23      Q.   Did you hear that he was riffed?  That his
24  job position was terminated around March of 2007?
25      A.   I don't know the particulars of his

Page 244

LORUSSO

1
2  departure.
3      Q.   But you know that he left?
4      A.   Yes.
5      Q.   Do you know whether it was voluntary or
6  involuntary?
7      A.   I don't know.
8      Q.   How did you hear that he'd left at all?
9      A.   In the conversation, probably, with
10  Gabriele Mariotti.
11      Q.   Of course Mr. Mariotti had left before you
12  left?
13      A.   Right.
14      Q.   But he hears things?
15      A.   I think that he probably is more in
16  contact with some folks from the company.  I
17  certainly am not — you know whom I am in contact
18  with.  I've already told you.
19      Q.   We've been through it.
20      A.   Yes.
21      Q.   The July 2006 worldwide Cargo meeting that
22  you weren't invited to, did you ever discuss with
23  Mr. Longo, Walter Longo why you weren't invited?
24      A.   Yes.  I had a conversation with him after
25  they came back.

Page 245

LORUSSO

1
2      Q.   And what did Mr. Longo say?
3      A.   I think he told me that it was Rome's
4  decision.
5      Q.   Did he explain who in Rome had made that
6  decision?
7      A.   I don't recall.
8      Q.   Did he give you any other rationale such
9  as well you were marketing coordination.  This had
10  nothing to do with marketing coordination.
11      A.   I don't recall.  Paul Baxtrum was customer
12  relations.
13      Q.   This states -- okay.  Do you know who has
14  that responsibility now?
15      A.   No.  The reason why I'm saying it was
16  because he was included in that meeting.
17      Q.   I got you.  And customer relations, as you
18  see it, is really part of the marketing function or
19  associated with the marketing —
20      A.   It was on the Passenger side.
21      Q.   Well, when you were in charge of it.
22          Now customer relations is associated with
23  pricing.  And, if you can believe me, also with
24  alliance and a few other things.
25          You mentioned that Tim O'Neill had a

One Penn Plaza, NYC
email@tobyfeldman.com

Toby Feldman, Inc.
NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS

tel (212) 244.3990
tel (800) 246.4950

Ester Lorusso                                                          12/19/2007

Page 246

LORUSSO
1
2    generous early retirement package. That was the
3    regular ERP, right?
4        A.   I believe so.
5        Q.   Tim didn't get anything more than the ERP
6    people did, as far as you know?
7        A.   No. But since Tim had been there a long
8    time, it was a generous package.
9        Q.   I just want to get at this was not a
10   special deal for Tim. Tim took the same deal that a
11   lot of other people took.
12       A.   I understand.
13       Q.   That's correct?
14       A.   That's correct.
15       Q.   Do you know who is vice president of Cargo
16   now of North America in New York?
17       A.   No, I don't.
18       Q.   Do you know where Mr. Longo is now?
19       A.   I believe he retired.
20       Q.   Do you know when he retired?
21       A.   It was at the end of December in 2006.
22       Q.   Okay, 2006. So he retired before your job
23   was terminated?
24       A.   Yes.
25       Q.   Have you had any communication with him

Page 248

LORUSSO
1
2        Q.   Did you tell anybody that you made copies
3    of them at that time?
4        A.   No.
5        Q.   Did you question Mr. Longo about that
6    incentive program?
7        A.   I don't believe I did.
8        Q.   Did you ask Mr. Porru about it?
9        A.   I don't believe I did.
10       Q.   Did you ask anybody in HR about it?
11       A.   I don't believe I did.
12       Q.   Did you discuss it with Mr. Baxtrum --
13       A.   No.
14       Q.   -- the incentive scheme?
15       A.   No.
16       Q.   Mr. Baxtrum doesn't know that you have a
17   copy of this letter, as far as you know?
18       A.   As far as I know.
19       Q.   How about Mr. DiFeo? Did you discuss it
20   with him?
21       A.   No, I did not.
22       Q.   As far as you know he doesn't know that
23   you have a copy of this letter?
24       A.   As far as I know.
25       Q.   So you're not aware of what explanation,

Page 247

LORUSSO
1
2    since he retired?
3        A.   No.
4        Q.   Have you had any communication with Mr.
5    Baxtrum since he left?
6        A.   No.
7        Q.   Have you had any communication with
8    anybody from Cargo since you left?
9        A.   No.
10       Q.   I'm going to ask you some questions about
11   the incentive scheme in Cargo.
12            How did you learn about it?
13       A.   I saw it.
14       Q.   You saw the incentive scheme?
15       A.   I saw the letters addressed to Paul
16   Baxtrum and Micheala DiFeo.
17       Q.   How did you come to see those letters?
18       A.   They were on the copy machine in the
19   office.
20       Q.   They were on the office copy machine?
21       A.   Yes, they were.
22       Q.   And you read them?
23       A.   Yes, I did.
24       Q.   And you made copies of them?
25       A.   Yes.

Page 249

LORUSSO
1
2    if any, there is for your not being part of the
3    incentive program? Correction. Nobody at Alitalia
4    has ever given you an explanation for why --
5        A.   I don't recall.
6        Q.   Sorry?
7        A.   I don't recall.
8        Q.   Well, you haven't asked anybody about it.
9    Do you think somebody volunteered that information?
10       A.   No.
11       Q.   Is that right?
12       A.   Yes.
13       Q.   Am I correct nobody at Alitalia has ever
14   said, well, of course you are not in this program,
15   Ms. Lorusso, because whatever?
16            MS. KURZON: Objection.
17       Q.   It's okay. You can answer.
18       A.   I honestly don't remember.
19       Q.   Okay.
20            MR. KORAL: Could we go off the record for
21   a moment.
22            MS. KURZON: Sure.
23            VIDEOGRAPHER: The time is 3:19 p.m. We
24   are going off the record.
25            (A break was taken.)

63 (Pages 246 to 249)

Page 250

LORUSSO

1
2    VIDEOGRAPHER:  The time is 3:22 p.m. We're
3  back on the record.
4    MR. KORAL:  Let us mark as Defendant's
5  Exhibit 5 a document from Ester Lorusso to
6  Andrea Sciarresi dated August 24, 2004.
7    (Defendant's Exhibit 5, document, was
8  marked for identification as of this date.)
9    Q.  Ms. Lorusso, did you send this document to
10 Mr. Sciarresi?
11   A.  Yes, I did.
12   Q.  What was your reason for sending it?
13   A.  This seems weird.
14   Q.  This is a document that we produced to
15 your attorneys?
16   A.  Yes.  I'm sorry.
17   Q.  Do you remember the question?  What was
18 your reason for sending it to Mr. Sciarresi?
19   A.  The reason for sending it to Mr. Sciarresi
20 is because I felt that I was being sexually
21 discriminated against.
22   Q.  The first statement you make, in the
23 second paragraph, is that you're the lowest paid
24 person at your level.
25     You mean that you were the lowest paid

Page 251

LORUSSO

1
2  director?
3    A.  Yes.
4    Q.  How did you know that?
5    A.  The three directors were — I think
6  Gabriele and I discussed it and he told me the other
7  salaries, his own salary and —
8    Q.  Mr. Mariotti told you his own salary and
9  other people's salaries?
10   A.  I believe so.
11   Q.  And he found those salaries in a photocopy
12 machine?
13   A.  No.  I don't know.
14     MS. KURZON:  Objection.
15   Q.  Did he tell you how he found them?
16   A.  No.
17   Q.  If I told you that Mr. D'Ilario's salary
18 was lower than yours, do you have any reason not to
19 believe that?
20   A.  Total compensation.  We are talking about
21 housing costs paid for as well.
22   Q.  In terms of salary, if I told you that Mr.
23 D'Ilario's salary was lower than yours, would you
24 have any reason not to believe that?
25   A.  Taking away the compensation, no, I have

Page 252

LORUSSO

1
2  no reason not to believe that.
3    Q.  When you say the compensation you are
4  talking about the ex-patriot benefits?
5    A.  Correct, meaning the total compensation.
6    Q.  Was your salary lower than that of the
7  director of public relations?
8    A.  Again, I considered her not part of our
9  entity because she reported to Rome and at a certain
10 point it was switched.  I don't remember exactly
11 when it was switched but she was — she was in a
12 separate division, let's say.
13     MS. KURZON:  Can we identify "she" for the
14 record?
15     THE WITNESS:  Martha Lotti.
16   Q.  Do you know how her compensation was
17 determined?
18   A.  No, I don't.
19   Q.  Do you know who determined it?
20   A.  No, I don't.
21   Q.  So it could be that New York determined
22 the compensation of the director of public
23 relations?
24   A.  Pardon me?
25   Q.  So it could be that New York determined

Page 253

LORUSSO

1
2  her compensation, correct?
3    A.  It could be, but I'm not sure.
4    Q.  All right.  And she was a director?
5    A.  Yes.
6    Q.  Do you know whether her compensation was
7  higher or lower than Mr. Mariotti's?
8    A.  I don't know.
9    Q.  Do you know if Mr. Mariotti knew what her
10 compensation was?
11   A.  No.  I don't know.
12   Q.  Just to clarify, we are talking about
13 Martha Lotti, correct?
14   A.  That's correct.
15   Q.  These directors that you're talking about,
16 "lowest paid person at my level," about whom are you
17 speaking?  You weren't talking about Lotti, you
18 don't know what her comp was.
19   A.  Correct.
20   Q.  You weren't talking about Mr. D'Ilario
21 because he was an ex-pat and he had a compensation
22 package.
23   A.  No.  I was talking about Mr. D'Ilario, Mr.
24 Mariotti and Mr. O'Neill.
25   Q.  You were talking about those three?

64 (Pages 250 to 253)

Ester Lorusso                                              12/19/2007

Page 254

LORUSSO
1
2     A.   Yes.
3     Q.   D'Ilario, you are talking about really his
4   whole package including his ex-pat --
5     A.   His compensation.
6     Q.   -- his ex-pat benefits plus his salary?
7     A.   His compensation, his total compensation.
8     Q.   Which consists of ex-pat benefits plus
9   salary.
10    A.   Call it what you will.
11    Q.   Well, do you disagree with that?
12    A.   No.
13    Q.   Do you know what Mr. O'Neill's salary was?
14    A.   Exactly?  No, but I'm sure it was higher
15  than mine.
16    Q.   Do you know what Mr. Mariotti's was?
17    A.   I don't remember.
18    Q.   Do you remember what yours was in August
19  of 2004?
20    A.   I believe it was $80,000.
21    Q.   You believe that O'Neill's was higher and
22  you believe that Mariotti's was higher?
23    A.   Correct.
24    Q.   And you believe that the whole value of
25  Mr. D'Ilario's compensation package was higher?

Page 255

LORUSSO
1
2     A.   That's correct.
3     Q.   Did you hear back from Mr. Sciarresi
4   regarding this e-mail?
5     A.   I don't recall.
6     Q.   You did eventually have a conversation
7   with Franco Gallo and Stephanie Di Clemente about
8   it?
9     A.   Yes, I did.
10    Q.   When you were in the Cargo Division, do
11  you know what your salary was relative to that of
12  Mr. Baxtrum and Mr. Guidotti?
13    A.   No, I don't.
14    Q.   So you don't know whether yours was higher
15  or lower than theirs?
16    A.   No, I don't.
17         MR. KORAL:  Let's move on.  We'll mark as
18  Defendant's Exhibit 6 a letter signed by Mr.
19  Scerasi and Mr. Libutti dated September 1, 2004
20  and stamped September, I believe it's 22, 2004.
21         MS. KURZON:  May I have a copy, please?
22         MR. KORAL:  I'm sorry.
23         It's stamped September 2, 2004.  To you.
24         (Defendant's Exhibit 6, letter, was marked
25  for identification as of this date.)

Page 256

LORUSSO
1
2     Q.   Did you discuss this letter with Mr.
3   Libutti and Mr. Sciarresi at any time?
4     A.   I don't recall.
5     Q.   There are two CC's on this letter.  One is
6   to TYNYC and one is to UGNYC.
7          Do you know what those stand for?
8     A.   I don't recall.
9     Q.   Do you recall receiving this letter?
10    A.   Yes, I do.
11    Q.   You did not regard this as a promotion, as
12  you've testified earlier.
13    A.   No.  It was a transfer.
14    Q.   But you don't dispute that you were called
15  managing director, do you?
16    A.   No, I don't.
17    Q.   And you don't dispute that your salary was
18  increased from $78,520.80 to $105,000 per annum?
19    A.   That's correct.
20    Q.   Correct?
21    A.   Yes.
22    Q.   And you continued on all the Alitalia
23  benefits, correct?
24    A.   Correct.
25    Q.   Did the GA2000 other employees besides you

Page 257

LORUSSO
1
2   and Mr. Farrow continue on Alitalia benefits?
3     A.   No.  Nor did they start on Alitalia
4   benefits.
5     Q.   "Continue" was the wrong word.
6          Did they ever get Alitalia benefits?
7     A.   No.
8          MR. KORAL:  Let's look at a document we'll
9   mark Defendant's Exhibit 7 from you to Andrea
10  Sciarresi dated September 1.
11         MS. KURZON:  September 1, 2004.
12         MR. KORAL:  2004.
13         (Defendant's Exhibit 7, document, was
14  marked for identification as of this date.)
15    Q.   Do you recall sending this to Mr.
16  Sciarresi?
17    A.   Yes, I do.
18    Q.   And you copied Mr. Libutti?
19    A.   Yes, I did.
20    Q.   You hadn't copied him on the letter we
21  just looked at, which was Exhibit 6, I believe.
22         Is there a reason why you didn't?
23         MS. KURZON:  He signed it.
24         MR. KORAL:  Not 6, 5.  The other e-mail to
25  Sciarresi.

65 (Pages 254 to 257)

Page 258

**LORUSSO**

1
2    A.   I don't recall.
3    Q.   Now, in fact, you hadn't, at this point,
4    accepted the position, correct?
5    A.   That's correct.
6    Q.   When is the last time you spoke with
7    Cynthia Gill?
8    A.   It must have been in 2004, the end of
9    2004.
10   Q.   Do you know whether she is an employment
11   lawyer, a lawyer with expertise in employment law
12   the way your current attorneys are?
13   A.   Yes.
14   Q.   She is?
15   A.   She is.
16   Q.   How did you find her?
17   A.   She was Kursheed Pakhiwala's attorney.
18   Q.   I'm sorry?
19   A.   She was Kursheed Pakhiwala's attorney?
20   Q.   She was Ms. Pakhiwala's attorney, okay.
21       For how long did you remain her client?
22   A.   A few months.
23   Q.   A few months?
24   A.   Yes.
25   Q.   So she continued to give you legal advice

Page 259

**LORUSSO**

1
2    over the next several months?
3        MS. KURZON:  Objection.
4    A.   I don't recall, to be honest.
5    Q.   Do you recall when you engaged her?
6    A.   When Libutti asked for me to be
7    transferred to GA2000, around that time.
8    Q.   Around that time, that's sometime in
9    August 2004?
10   A.   July or August 2004.
11   Q.   And she continued as your attorney for
12   several months?
13   A.   I don't recall.
14   Q.   I'm sorry.  You just said that so I just
15   wanted to clarify that.
16   A.   I know.  It was a few months.
17   Q.   Do you recall at some point discharging
18   her as your attorney?
19   A.   No.
20   Q.   How did the relationship come to an end
21   then?
22   A.   I think Ms. Gill was about to move to
23   another state.
24   Q.   So you think she actually moved and that
25   was the end of that relationship?

Page 260

**LORUSSO**

1
2    A.   I believe so.
3    Q.   So obviously you made no attempt to
4    contact her at the time you later contacted Mr.
5    Behrins?
6    A.   That's correct.
7    Q.   Do you know what state she moved to?
8    A.   I remember her mentioning Florida.
9    Q.   Sounds good to me.
10       MR. KORAL:  We'll mark as Defendant's 8 a
11   document to file from Stephanie Di Clemente
12   dated Wednesday, September 22, 2004.
13       MS. KURZON:  September 2?
14       MR. KORAL:  That's a strange thing.
15       Let's go off the record while I figure
16   this out.
17       VIDEOGRAPHER:  The time is 3:37 p.m.  We
18   are going off the record.
19       (A break was taken.)
20       VIDEOGRAPHER:  The time is 3:38 p.m.  We
21   are back on the record.
22   Q.   Let me just ask you a couple of questions
23   about a meeting that you've already testified you
24   recall having with Mr. Gallo and Stephanie Di
25   Clemente.

Page 261

**LORUSSO**

1
2        The first question is:  Who called the
3    meeting?
4    A.   It was Mr. Gallo, I believe.
5    Q.   Did it take place in his office?
6    A.   Yes, it did.
7    Q.   Did Mr. Gallo explain what the meeting was
8    about?
9    A.   Yes.
10   Q.   Did he tell you he was investigating your
11   discrimination complaint?
12   A.   Yes.
13   Q.   And he asked you a series of questions?
14   A.   Yes.
15   Q.   You got an opportunity to speak, correct?
16   A.   Yes.
17   Q.   Did Ms. Di Clemente say anything?
18   A.   I don't recall.
19   Q.   Do you recall that she was taking notes?
20   A.   Yes.
21   Q.   Prior to this litigation, had you ever
22   seen any copies of those notes?
23   A.   No.
24   Q.   Were you satisfied with the meeting you
25   had with Mr. Gallo and Ms. Di Clemente?

One Penn Plaza, NYC                              Toby Feldman, Inc.                         tel (212) 244.3990
email@tobyfeldman.com            NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS          tel (800) 246.4950

Page 262

LORUSSO

1
2      MS. KURZON: Objection.
3      Q.   You can answer, if you can.
4      A.   The meeting was just to ask me some
5   questions so that they would get back to me. In
6   other words, the investigation was supposed to be
7   done after this meeting.
8      Q.   That was your understanding, that Mr.
9   Gallo was going to go out and investigate now?
10     A.   That's correct.
11     Q.   And your belief is that he never did?
12     A.   That's correct.
13     Q.   Did he ever communicate anything about his
14  investigation to you?
15     A.   I don't believe so.
16     Q.   Did you ever ask him about it?
17     A.   I don't recall.
18     MR. KORAL: Let's take a look at a
19  document that we can mark as Defendant's
20  Exhibit 8.
21     (Defendant's Exhibit 8, document, was
22  marked for identification as of this date.)
23     Q.   Let me ask, do you recall sending this to
24  Mr. Libutti?
25     A.   Yes, I do.

Page 263

LORUSSO

1
2      MR. KORAL: This is an e-mail from Ester
3   Lorusso to Guilio Libutti dated September 16,
4   2004, and the subject is 9/16/2004.
5      MS. KURZON: It's to Libutti and Gallo?
6      MR. KORAL: I'm sorry?
7      MS. KURZON: To Libutti and Gallo?
8      MR. KORAL: Yes. It goes to Libutti and
9   to Gallo.
10     Q.   First, let me ask -- you've already
11  testified you remember sending it. Did you ever get
12  an explanation as to why you did not get to go to
13  this meeting at headquarters on September 13 and 14?
14     A.   I don't recall.
15     Q.   You state that at present Alitalia lacks a
16  human resources director. What happened to Mr.
17  Sciarresi, if you recall?
18     A.   I believe he was in the hospital.
19     Q.   Do you have any idea why?
20     A.   He had mental issues.
21     Q.   Did he have something that people were
22  calling a nervous breakdown?
23     A.   That was the rumor at the time.
24     Q.   Did you ever see Mr. Sciarresi again after
25  he was hospitalized around September of 2004?

Page 264

LORUSSO

1
2      A.   No. I did not.
3      Q.   The meeting at headquarters was a sales
4   meeting, correct? That's what this memo says.
5      A.   Yes.
6      Q.   Had you ever been invited to sales
7   meetings at headquarters prior to September of 2004?
8      A.   I don't recall.
9      Q.   Okay.
10     MR. KORAL: Let's move on. We'll mark as
11  Defendant's Exhibit 9 a letter from Alitalia
12  signed by Mr. Libutti and Mr. Gallo to Ms.
13  Lorusso, dated September 17, 2004.
14     (Defendant's Exhibit 9, letter, was marked
15  for identification as of this date.)
16     Q.   Do you recall seeing this before, Ms.
17  Lorusso?
18     A.   Yes, I do.
19     Q.   Do you recall seeing it at the time that
20  it was apparently sent, around September 17, 2004?
21     A.   Yes, I do.
22     Q.   Let me ask you, first, what is ZZ-NYC
23  mean?
24     A.   That was a code for my department.
25     Q.   And "the department" being marketing

Page 265

LORUSSO

1
2   communications?
3      A.   That's correct.
4      Q.   Does this refresh your recollection as to
5   whether you given an explanation -- whether you
6   liked it or not -- about the meeting on September
7   13, 14 at headquarters?
8      A.   Yes, it does.
9      Q.   Did you have any discussion about this
10  letter with Mr. Gallo after you received it?
11     A.   I don't recall.
12     Q.   Did you have any discussion with Mr.
13  Libutti about this letter after you received it?
14     A.   I don't recall.
15     Q.   Do you recall discussing this letter with
16  anybody?
17     A.   I don't recall.
18     Q.   Did you understand from this letter that
19  you had to make up your mind about the GA2000
20  position sometime between September 17 and September
21  20, that they were giving you an ultimatum, in
22  effect?
23     A.   Yes.
24     Q.   Did you discuss with Mr. Gallo the fact
25  that you were being given an ultimatum about that

67 (Pages 262 to 265)

Ester Lorusso                                                           12/19/2007

Page 266

LORUSSO

1    LORUSSO
2    position?
3        A.  I don't recall.
4        Q.  Did you discuss that with Mr. Libutti?
5        A.  I don't recall.
6        Q.  Did you discuss it with anybody else?
7        A.  I don't recall.
8        Q.  Was Ms. Gill still your attorney at this
9    point, September 17?
10       A.  I am trying to remember.  I believe she
11   was.
12       Q.  I don't want to know the contents of
13   anything that she said, but you don't recall
14   actually whether she was your attorney?
15       A.  I believe she was.
16       Q.  Again, without discussing the contents of
17   anything you or she said, did you discuss this memo
18   with Ms. Gill or -- no, let me ask that first, if
19   you recall?
20       A.  I don't recall.
21       Q.  Did you discuss the ultimatum aspect of it
22   with Ms. Gill, if you recall?  Don't tell me what
23   she said or what you said.
24       A.  I may have.
25           MR. KORAL:  Here we have Defendant's

Page 267

LORUSSO

1    LORUSSO
2        Exhibit 10, an e-mail from Ester Lorusso to
3    Libutti and Gallo, dated September 20, 2004,
4    subject your letter dated 9/17.
5            (Defendant's Exhibit 10, e-mail, was
6        marked for identification as of this date.)
7        Q.  Looking at this memo, do you recall
8    sending it?
9        A.  Yes, I do.
10       Q.  You state that you were the only director
11   who was not invited to the meeting?
12       A.  That is correct.
13       Q.  Do you know whether Ms. Lotti was invited?
14       A.  Again, Ms. Lotti was not part of our
15   division so I don't consider her --
16       Q.  Explain what you mean by "division."  She
17   was not part of Passenger?
18       A.  She was part of Passenger, but she did not
19   meet with us.  We had no --
20       Q.  Ms. Lotti was in charge of public
21   relations and she did not meet with people in the
22   rest of the Passenger Division?
23       A.  No.  She did not.
24       Q.  Do you know if she met with Mr. Libutti?
25       A.  I don't know.

Page 268

LORUSSO

1    LORUSSO
2        Q.  Do you know if she met with Mr. Galli?
3        A.  I don't know.
4        Q.  Do you know if she traveled to Rome?
5        A.  I believe she did.
6        Q.  For meetings?
7        A.  I don't know.
8        Q.  As opposed to pleasure, I mean.
9        A.  I don't know.
10       Q.  Was Ms. Lotti a U.S. national or was she
11   an ex-pat?
12       A.  She was a U.S. national.
13       Q.  Did you ever discuss this memo with Mr.
14   Gallo?
15       A.  I don't recall.
16       Q.  Did you ever discuss this memo with Mr.
17   Libutti?
18       A.  I don't recall.
19       Q.  Do you know whether Mr. D'Oro was at that
20   meeting on September 13, 14 in Rome?
21       A.  I don't know.
22       Q.  Mr. D'Oro was vice president, was he not?
23       A.  I don't know.
24       Q.  He was either a vice president or director
25   in 2004?

Page 269

LORUSSO

1    LORUSSO
2        A.  Correct.
3            MR. KORAL:  We'll move on to Defendant's
4        Exhibit 11 which is a confidential memo to Ms.
5        Ester Lorusso signed by it looks like Stephanie
6        Di Clemente for Andrea Sciarresi and by Guilio
7        Libutti, dated October 13, 2004.
8            (Defendant's Exhibit 11, memo, was marked
9        for identification as of this date.)
10       Q.  Do you recall receiving this?
11       A.  Yes, I do.
12       Q.  Does this refresh your recollection as to
13   the effective date of the promotion?
14       A.  Yes, it does.
15       Q.  That was November 1?
16       A.  That's correct.
17       Q.  Starting at that time you began collecting
18   the $105,000 salary?
19       A.  That is correct.
20           MR. KORAL:  Defendant's 12 will be a memo
21       to file from Stephanie Di Clemente, dated
22       October 25, 2004, subject Libutti's rebuttal
23       reference, Lorusso's claim.
24           (Defendant's Exhibit 12, memo, was marked
25       for identification as of this date.)

68 (Pages 266 to 269)

Ester Lorusso                                                          12/19/2007

Page 270

LORUSSO
1
2    Q.  The first question is, have you seen this
3    before.  You haven't seen it yet, have you?
4    A.  Have I seen this before?  Yes, I have.
5    Q.  When did you first see it?
6    A.  From my attorney, recently.
7    Q.  In preparation for this deposition?
8    A.  Yes.
9    Q.  Mr. Libutti says that after Paolo Rubino
10   left his position in home office marketing — in
11   home office, sorry, that marketing initiatives from
12   the U.S. would carry less weight and importance in
13   the office.  He denies that he was making a threat
14   to your position, that that was just in effect.
15       Do you accept that?  Do you recollect now
16   that Mr. Libutti said to you, Well, with Rubino gone
17   from marketing they're not going to pay as much
18   attention to the U.S. on marketing issues?
19   A.  I don't recall that it was stated that
20   way.  I recall him mentioning Rubino, but not that
21   sentence that way.
22   Q.  Mr. Libutti states that he never wrote
23   nasty e-mails to you, but only working e-mails
24   reminding you to pay more attention to his work.
25   You disagree with that?

Page 271

LORUSSO
1
2    A.  Yes.  His tone was always nasty when he
3    wrote to me.
4    Q.  Do you have any samples of that?  I
5    understand that you don't have them with you but can
6    you recall anything specific that you thought was
7    nasty -- that you felt was nasty?  I understand that
8    these were written long ago on the one hand, but on
9    the other hand you have been going over a lot of
10   stuff in preparation for deposition so perhaps
11   something stands up in your mind?
12   A.  I don't recall at this moment.
13   Q.  What is ENIT in paragraph 3?
14   A.  The Italian government tourist office.
15   Q.  The Italian government tourist office?
16   A.  Yes.
17   Q.  And AZ is the code for Alitalia, correct?
18   A.  That is correct.
19   Q.  Libutti is stating that the symposium was
20   organized by the Italian government tourist office
21   and that Alitalia's involvement was only in choosing
22   the trade segment and making reservations.
23       Is that true?
24   A.  That's not true.
25   Q.  What's false about it?

Page 272

LORUSSO
1
2    A.  The entire statement.  Alitalia was the
3    originator of the yearly symposium.
4    Q.  So Alitalia's involvement was not only in
5    choosing a trade segment and making the
6    reservations?
7    A.  That's correct.
8    Q.  Is it true that you were one of the key
9    speakers at the symposium?
10   A.  Yes, I was.
11   Q.  What does OM stand for in paragraph 4, if
12   you know?
13   A.  That was Tim O'Neill's department.
14   Q.  And Mr. Libutti says that it's not true
15   that Grace DeFranco got the planning, I guess, of
16   the symposium.
17       Do you know now whether it's true or not
18   that Grace got the planning of the symposium?
19   A.  She got the planning of the symposium.
20   Q.  You say she did?
21   A.  Yes, she did.
22   Q.  Do you have any documentation for that
23   that you looked at, say, recently?
24   A.  The planner up until that point was
25   Elizabeth Santella.

Page 273

LORUSSO
1
2    Q.  In your department?
3    A.  Yes.
4    Q.  How do you know that it went over to
5    Grace?
6    A.  She was doing the work.
7    Q.  She was doing the work?
8    A.  Yes.
9    Q.  How much work was involved?  A day?  A
10   week?  A month?  A year?
11   A.  A few weeks.
12   Q.  Sorry?
13   A.  A few weeks.
14   Q.  Full time?
15   A.  No.
16   Q.  You mean the planning took a few weeks to
17   do it but it was just part of somebody's job.  It
18   wasn't a full time kind of thing?
19   A.  Correct.
20   Q.  Did you recall telling Mr. Gallo that Mr.
21   O'Neill's staff was inexperienced?
22   A.  Repeat the question, please.
23       (Testimony was read back.)
24   Q.  I'm sorry.  Let me correct that.  It
25   wasn't Mr. Gallo.  It was Mr. Libutti?

69 (Pages 270 to 273)

Page 282

LORUSSO

1
2     Q.  I will ask, did you look at this document
3  in connection with your preparation for today's
4  deposition?
5     A.  Yes.
6     Q.  And you saw Libutti's comments?
7        MS. KURZON:  Objection.  Again, these are
8     not handwritten comments from Libutti, are
9     they?  Didn't we just discuss that those would
10    have been in Italian?
11       MR. KORAL:  Well, she said that, but these
12    are Libutti's handwritten comments.  I'm
13    representing that they are.
14       MS. KURZON:  I trust your representation.
15       MR. KORAL:  When you finally take Mr.
16    Libutti's deposition you can ask him about it,
17    but I believe he wrote these comments and then
18    had a meeting with Gallo and Stephanie and
19    explained himself.
20    Q.  The first question, Ms. Lorusso, did
21 Stephanie Di Clemente speak Italian?
22    A.  I don't know.  I don't think so.
23    Q.  She is American?
24    A.  Yes, she is.
25    Q.  And she speaks English without a

Page 283

LORUSSO

1
2  noticeable foreign accent?
3     A.  Yes.
4     Q.  You just don't know whether she speaks
5  Italian, say, as you do, because you speak English
6  without an accent at all?
7     A.  I've never heard her.  I have never heard
8  her speak Italian.
9     Q.  Did you ever send her anything in writing
10 in Italian?
11    A.  No.
12       MR. KORAL:  Really all I wanted to do was
13    to get this on the record because this is, I
14    believe, the attachment to the prior exhibit.
15       This is Defendant's 14.  It is an e-mail
16    from Andrea Porru to Ester Lorusso with a copy
17    to Walter Longo.  The subject is Cargo
18    position.
19       (Defendant's Exhibit 14, e-mail, was
20    marked for identification as of this date.)
21       MR. KORAL:  Let me represent that this is
22    actually a three-page document consisting of an
23    original e-mail from Ester Lorusso to Walter
24    Longo with a copy to Mr. Porru, dated
25    Wednesday, 27 December 2006, and a response on

Page 284

LORUSSO

1
2  Wednesday, 11 October, from Mr. Porru.
3     Q.  Did you review this e-mail chain or these
4  two e-mails, Ms. Lorusso, prior to today?
5     A.  Yes, sir.
6     Q.  Do you recall receiving Mr. Porru's e-mail
7  at the time it was sent?
8     A.  Yes, sir.
9     Q.  Did you discuss this communication with
10 Mr. Porru?
11    A.  I don't believe so.
12    Q.  Did you discuss it with Mr. Longo?  And by
13 "it" I mean Mr. Porru's e-mail to you.
14    A.  I don't recall.
15    Q.  What about the e-mail addressed originally
16 to Walter Longo with a copy to Mr. Porru that you
17 sent.
18       Did you discuss that with Mr. Longo?
19    A.  I don't recall.
20    Q.  Do you recall discussing it with anybody,
21 apart from your lawyers in connection with your
22 lawsuit?
23    A.  I don't recall.
24    Q.  Did you have conversations with Mr. Porru
25 about your discrimination complaint at any time

Page 285

LORUSSO

1
2  following September 17?
3     A.  I don't believe so.
4     Q.  No?
5     A.  I don't recall.
6     Q.  Okay.  You don't recall?
7     A.  I don't recall.
8     Q.  Do you know whether Mr. Porru made any
9  investigation of your complaint?
10    A.  I believe that the day that I was
11 terminated I was given a response.
12    Q.  All right.  Did Mr. Porru attempt to talk
13 to you about these claims, about your discrimination
14 claim while you were still employed?
15    A.  I believe so.
16    Q.  Did you refuse to speak with him?
17    A.  I think it was after I was terminated.
18    Q.  Did you refuse to speak with him?
19    A.  Yes.
20    Q.  Yes?
21    A.  Yes.
22    Q.  Do not tell me anything that you were
23 advised by your attorneys.  Other than that, can you
24 describe your reason for not doing it, if it was
25 your own.

72 (Pages 282 to 285)

Ester Lorusso                                                          12/19/2007

Page 286

LORUSSO

1
2    A.   No.  No, I cannot.
3    Q.   I got you.
4         MR. KORAL:  I could actually use a
5    five-minute break.
6         VIDEOGRAPHER:  The time is 4:15 p.m. We
7    are going off the record.
8         (A break was taken.)
9         VIDEOGRAPHER:  This is tape number 5 of
10   the videotape deposition of Ms. Ester Lorusso.
11   The time is now 4:25 p.m. We are back on the
12   record.
13        MR. KORAL:  We will mark as Defendant's 15
14   an e-mail from Andrea Porru to Ester Lorusso,
15   dated Tuesday, November 7, 2006, subject
16   Wednesday's meeting.  Copied are Walter Longo
17   and Thierry Aucoc.
18        (Defendant's Exhibit 15, e-mail, was
19   marked for identification as of this date.)
20   Q.   Ms. Lorusso, have you seen this before?
21   A.   Yes.
22   Q.   Did you receive it at that time it's
23   dated?
24   A.   Yes, I did.
25   Q.   This is a response from Mr. Porru to you?

Page 287

LORUSSO

1
2    A.   That's correct.
3    Q.   Regarding a memo that you sent on Monday,
4    November 6, to Mr. Porru, copying Walter Longo and
5    Thierry Aucoc.
6         You've already testified that you had your
7    meeting with Mr. Porru regarding the director of
8    regulatory affairs position, right?
9    A.   That's correct.
10   Q.   But you never heard back from Mr. Porru
11   about the results?
12   A.   At this point, I don't think so.
13   Q.   But you are not aware of anybody else
14   being hired for that position?
15   A.   No.
16   Q.   At the time you left Alitalia, do you know
17   whether Mr. Orlando D'Oro was still acting as a
18   consultant for the regulatory affairs position?
19   A.   I believe he was.
20   Q.   Did Mr. Porru ever discuss with you --
21   pardon me, ever meet with you to discuss this
22   investigation?
23   A.   No.
24   Q.   Did you seek such a meeting after you
25   received this e-mail from Mr. Porru?

Page 288

LORUSSO

1
2    A.   I don't recall.
3         MR. KORAL:  Let's move on.  Defendant's
4    16.
5         I'm sorry.  This document was
6    inadvertently produced and I would like all the
7    copies, please, including the one we produced
8    to you.
9         I think these are privileged documents.
10        MS. KURZON:  It's Bates stamped.
11        MR. KORAL:  I said it was inadvertently
12   produced.  I will make that request as well.
13        I am requesting on the record that you
14   return to us all copies of the document Bates
15   stamped Defendant's 17 to 21.
16        MS. KURZON:  17 to 21?
17        MR. KORAL:  Yes.
18        MS. KURZON:  So we're not counting as
19   Exhibit 16?
20        MR. KORAL:  No.
21        MS. KURZON:  I just want to make sure for
22   my numbers.
23        MR. KORAL:  It's withdrawn.
24        We'll mark as Defendant's Exhibit 16 a
25   document from Walter Longo to Andrea Porru,

Page 289

LORUSSO

1
2    dated 9 November with a copy to Luca Bruni,
3    regarding a Cargo position.  And it references
4    an Ester Lorusso e-mail and other documents.
5         (Defendant's Exhibit 16, document, was
6    marked for identification as of this date.)
7    Q.   Have you seen this document before?
8    A.   I believe I have.
9    Q.   All right.  Did you ever discuss it with
10   Walter Longo?
11   A.   This document?
12   Q.   Yes.
13   A.   No.
14   Q.   It responds to an e-mail from Mr. Porru to
15   Mr. Longo with a copy to Mr. Bruni regarding the
16   Cargo position dated October 30 in which Mr. Porru
17   states that he is conducting an investigation of
18   your allegations of sex discrimination and
19   retaliation.
20        Did you read Mr. Porru's e-mail?
21   A.   Yes.
22   Q.   At the time you were complaining about
23   being put on probation when you assumed the Cargo
24   position, correct?
25   A.   Correct.

73 (Pages 286 to 289)

Page 290

LORUSSO

1
2   Q.   That was because you hadn't been put on
3   probation when you assumed the position in GA2000?
4   A.   That's one of the reasons.
5   Q.   What are the other reasons?
6   A.   When Tim O'Neill came into Alitalia he was
7   not put on probation either?
8   Q.   How do you know that?
9   A.   He told me.
10  Q.   You asked him or he just volunteered that
11  he wasn't put on probation?
12  A.   I believe I asked him.
13  Q.   When did you ask him?
14  A.   I don't recall.
15  Q.   Did you ask him at the time he came in to
16  Alitalia?
17  A.   I don't recall.
18  Q.   Do you recall whether it was around the
19  time that you went into Cargo?
20  A.   Most probably.
21  Q.   Did you pass the probation?
22  A.   Yes, I did.
23  Q.   You got a letter from Walter Longo telling
24  you that?
25  A.   Yes, I did.

Page 291

LORUSSO

1
2   Q.   Did you suffer any ill effects from being
3   on probation?
4   MS. KURZON:  Objection.  I don't know what
5   you mean.
6   MR. KORAL:  Okay.  Well, let's see if she
7   does.
8   A.   I'm sorry.  I don't know what you mean.
9   MS. KURZON:  Ill effects?  Physical
10  effects?
11  MR. KORAL:  You made your objection.
12  Q.   Did anything bad happen to you as a result
13  of being on probation?
14  A.   No.
15  Q.   Okay.  Let's move on, then.
16  No, let's go back -- I'm sorry -- to 16,
17  again.  In paragraph 1B on the first page of this
18  document, Mr. Longo tells Mr. Porru, "Mrs. Lorusso's
19  records in her Cargo responsibility show that she
20  carried out concrete tests supporting informational
21  events occurred.  In particular, she supported the
22  launch of the new stations, e.g. Atlanta and Los
23  Angeles, the opening/moving of new warehouses,
24  Boston and" -- I don't know what YUL is --
25  A.   Canada.

Page 292

LORUSSO

1
2   Q.   -- "and the fliers announcing the updates
3   of Alitalia Cargo.  Moreover, she took care of the
4   organization of the agents database."
5   Is that true?
6   A.   This is true, but you should know that
7   what you just read took up about 10 percent of my
8   time.
9   Q.   What took up the other 90 percent?
10  A.   Nothing.
11  Q.   You did nothing for 90 percent of your
12  time while were you in the Cargo Division?
13  A.   I would say so, other than working on the
14  agents database which was just inputting data.
15  Q.   What about the fliers?
16  A.   Oh, I could do those in five minutes flat.
17  Q.   What about the supporting of the launch of
18  the new stations?
19  A.   Same thing.
20  Q.   You didn't do much in connection with
21  that?
22  A.   I didn't do much.
23  Q.   Mr. Longo at some point stated that he had
24  encouraged you to get out to the stations and become
25  familiar with them, and that you hadn't done that.

Page 293

LORUSSO

1
2   Did he encourage you to do that?
3   A.   No.  He did not.
4   Q.   Did you do it?
5   A.   No.  I did not.
6   Q.   Did you ever propose going out to the
7   stations?
8   A.   Yes, I did.
9   Q.   To whom?
10  A.   To the various managers.  Actually, to one
11  in particular.
12  Q.   Which one?
13  A.   Ferrante, I believe his name is.
14  Q.   Sorry?
15  A.   Ferrante, F-E-R-R-A-N-T-E.
16  Q.   Where is Mr. Ferrante?
17  A.   At JFK.
18  Q.   Mr. Ferrante was the station manager at
19  JFK?
20  A.   I don't remember his title.
21  Q.   Wasn't Mr. De Rienzo in charge of JFK, if
22  you know?
23  A.   I don't remember.
24  Q.   Anyway, you contacted Mr. Ferrante
25  directly?

74 (Pages 290 to 293)