**Exhibit A**

LEXSEE

**AQUILA KNIGHT, Plaintiff, - against - NEW YORK CITY HOUSING AUTHORITY, Defendant.**

**03 Civ. 2746 (DAB)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**2007 U.S. Dist. LEXIS 9148**

**January 31, 2007, Decided
February 2, 2007, Filed**

**CORE TERMS:** summary judgment, hiring, employment application, genuine, hire, prima facie case, sex, processing, borough, motive, issues of material fact, discriminatory, partial, staff, mixed, employment discrimination, community center, recommendation, impermissible, housing, email, Pl Mem of Law, employment decision, citations omitted, moving party, decision maker, reasonable cause, controvert, opposing, delayed

**COUNSEL:** [*1] For Aquila Knight, Plaintiff: Jeffrey C. Slade, LEAD ATTORNEY, Slade & Associates, P.C., New York, NY; Chinyere Y Okoronkwo, Law Firm of Chinyere Okoronkwo, Esq, New York, NY.

For New York City Housing Authority, Defendant: Jeffrey Niederhoffer, LEAD ATTORNEY, Jeffrey Schanback, General Counsel, New York, NY; Jeffrey Marc Niederhoffer, LEAD ATTORNEY, New York City Housing Authority Law Department, New York, NY.

**JUDGES:** Deborah A. Batts, United States District Judge.

**OPINION BY:** Deborah A. Batts

**OPINION**

*MEMORANDUM & ORDER*

DEBORAH A. BATTS, United States District Judge.

Aquila Knight ("Plaintiff") brings this action for back pay and related benefits pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, the New York State Human Rights Law, Executive Law § 296 and New York City Administrative Code § 8-502.

Plaintiff alleges that the New York City Housing Authority ("Defendant") unlawfully discriminated against her on the basis of her sex. She specifically alleges that Defendant offered her employment as a "Community Coordinator" at the Butler Community Center ("Butler"), located in the Bronx, on May 10, 2001. Defendant, however, [*2] allegedly deliberately delayed completing the processing of her employment application for eighteen months because she is a woman. Plaintiff became aware of the alleged sex-based animus behind the delay in completing her employment application when one of Defendant's employees involved in the hiring process allegedly told her in June, 2001 that a man was needed to fill the Community Coordinator position at Butler.

Defendant moves for summary judgment and Plaintiff cross-moves for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth, Defendant's Motion for Summary Judgment is GRANTED with respect to each of the Plaintiff's claims and Plaintiff's Cross-motion for Partial Summary Judgment is DENIED.

I. BACKGROUND

In response to Defendant's Motion for Summary Judgment, Plaintiff submitted her Statement of Facts pursuant to Local Civil Rule 56.1 ("Statement of Facts"). With few exceptions, Plaintiff's Statement of Facts fails to comply with the requirements of Local Civil Rule 56.1. [1] Most of Plaintiff's responses to the paragraphs in Defendant's Statement of Facts either do not controvert [*3] the statements made by the Defendant or they state that Plaintiff lacks the knowledge to admit or deny the truth of Defendant's statements. Additionally where Plaintiff's responses do not directly controvert Defendant's statements, Plaintiff nevertheless attempts to rebut

Defendant's statements by offering either non-responsive statements or responsive statements that are unsupported by citations to the record. Pursuant to Local Civil Rule 56.1 Defendant's statements are deemed to be admitted where Plaintiff has failed to specifically controvert them with citations to the record.

> 1   Local Civil Rule 56.1 provides that a party opposing summary judgment must submit a statement of facts that "shall include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party." The rule further provides that "[e]ach numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." Local Civil Rule 56.1(b) - (c). Each statement made by the opposing party in the statement of facts must be followed by a citation to evidence which would be admissible. Local Civil Rule 56.1(d).

 [*4] Defendant is a public corporation formed pursuant to the New York State Public Housing Law for the purpose of furnishing housing to low-income residents in New York City. (Def. Local Rule 56.1 Stmt. P 1.) The Department of Community Operations ("DCO") is one of several departments within the Defendant's organization, providing cultural, educational and recreational services to residents living in housing developments managed by the Defendant. (*Id.* P 2.) Within each of New York City's five boroughs, Defendant maintains a borough office headed by a Director and a Deputy Director. (*Id.*)

Plaintiff states that in 1999 she submitted an application to Defendant for a "Community Coordinator" position. (Pl. Local Rule 56.1 Stmt. P 8.) Defendant claims that no "Community Coordinator" positions were available at the time of the application and that Plaintiff had turned down a "Director" position because she wanted to be a Coordinator. (Def. Reply Local Rule 56.1 Stmt. P 8; Pl. Compl. P 9.)

On August 23, 2000, Ernesto Lozano, Director of the Bronx borough office, sent a memo to his superior, Kevin Kearney, the Senior Director of DCO, requesting that Plaintiff be hired for the Community [*5] Coordinator position at Butler, a housing development managed by Defendant. (Aff. of Okoronkwo at Ex. 4.) In March of 2001, the DCO was engaged in a reorganization involving the transferring of staff from the Bronx borough office to positions in the field. (Def. Local Rule 56.1 Stmt. P 5.) During the reorganization Lozano met with staff members to determine their preferences for transfer. Following these discussions, Lozano sent an email to his supervisor stating in part that staff member Israel Rivera could be considered for potential reassignment to Butler. (*Id.*; Aff. of Okoronkwo at Ex. 20.)

On March 22, 2001, after these preferences were revealed, the Deputy General Manager for Community Operations Hugh Spence requested that the Director of Human Resources Madelyn Oliva process the transfers, including the transfer of Rivera to Butler. (Def. Local Rule 56.1 Stmt. P 6.) Spence was wholly unaware of Plaintiff's interest in being employed as Community Coordinator at Butler at the time of his request. (Spence Decl. P 6.)

Rivera was sent to Butler to fill the position of "Community Coordinator," but his functional role was to serve as a community center support staff member with [*6] the job duties of overseeing work required to make the center operational and to maintain compliance with New York City health regulations. Rivera's duties included activities such as clearing debris, fixing holes in walls and installing appliances and telephone lines. (Def. Local Rule 56.1 Stmt. P 7; Pl. Local Rule 56.1 Stmt. P 7.)

The Parties, however, disagree as to the precise scope of Rivera's responsibilities. Plaintiff offers the testimony of Gary Coleman, President of the Butler Houses Residents Association, who claims to have observed Rivera supervising staff persons and claims to have observed that Rivera had referred to himself as "Director" of Butler. (Aff. of Okoronkwo at Ex. 23.) Rivera himself states that he went unsupervised for about a month, but that he was supervised thereafter and that he was sent to Butler to facilitate repairs. He denies that he had staff persons reporting to him during his time at Butler. (*Id.* at Ex. 27.) Prior to his transfer to Butler, Rivera had held the title of Community Coordinator since 1998. (*Id.* at Ex. 27, Rivera Aff. of Changes.) In December 2001, Rivera was re-transferred from Butler to Soundview Senior Center. (Rivera Decl. [*7] P 2.)

Around late March 2001, Plaintiff was interviewed by Ilia Figueroa, the Deputy Director of the Bronx borough office for the position of Director of Butler Houses Community Center which had the underlying civil service title of "Community Coordinator." (Def. Local Rule 56.1 Stmt. P 8.) Defendant alleges that no other candidates were interviewed or considered for the Community Coordinator position at Butler subsequent to Plaintiff's interview. (*Id.* P 17.) Figueroa prepared a request to hire Plaintiff which she submitted to Lozano and then to Kearney for review and approval shortly after the interview. (*Id.*)

A letter dated May 10, 2001 was sent to Plaintiff stating: "Congratulations, You have been selected for a

position as a Community Coordinator at Butler Community Center." (Aff. of Okoronkwo at Ex. 5.) Plaintiff alleges, however, that on or about June 25, 2001, Figueroa told her during a telephone conversation that a man was placed at Butler because Defendants needed someone there with strength. (Pl. Local Rule 56.1 Stmt. P 8(f); Aff. of Okoronkwo at Ex. 30.) No other evidence in the record aside from Plaintiff's testimony regarding this alleged statement is offered [*8] to support the claim that the processing of Plaintiff's employment application was delayed because of her sex. Figueroa denies having made any such statement. (Decl. of Figueroa P 12.) Even after Figueroa's alleged statement Defendant continued to process Plaintiff's application for the Community Coordinator position at Butler.

In August 2001, Defendant discovered that when Rivera was transferred to Butler from the Bronx borough office in March 2001, the budgetary "line" formerly occupied by Rivera at the borough office, Line 37895, did not transfer to the Butler facility. As a result, Rivera occupied the only Community Coordinator budget line at Butler, Line 42068. (Def. Local Rule 56.1 Stmt. PP 12-13.) Since there was thus no funding available for Plaintiff to fill a position at Butler, Kearney was required to approve the use of another line, Line 37805, for use at Butler so that Plaintiff's hiring could proceed. (*Id.* P15.) In October 2001, Kearney approved the request, submitted by Lozano and prepared by Figueroa, to hire Plaintiff as a Community Coordinator at Butler and approved the use of budget line number 37805 to effectuate the hiring. (*Id.* P 16.) After the request [*9] to hire Plaintiff had been approved by Kearney, it was submitted to Defendant's Human Resources Department in November 2001. (*Id.* P 18.)

The parties dispute the source of sole hiring authority within Defendant's organization. Defendant alleges that the Human Resources department has sole authority to hire individuals for employment and that other departments within the Defendant's organization must submit requests to the Human Resources department to hire staff. (*Id.* P 19.) Plaintiff has not offered evidence to controvert this allegation. Defendant offers the declaration of Oliva in support of its claim that the Human Resources department has sole hiring authority.

The processing of employment applications clearly takes place within the Human Resources department. Within the Human Resources department, Donna Williams, a Placement Coordinator, undertook primary responsibility for processing the request to hire Plaintiff. (*Id.* P 20.) In March and April of 2002, Williams met with Plaintiff on two different occasions in the course of completing the processing of Plaintiff's employment application. (*Id.*) Subsequent to the second meeting Williams forwarded Plaintiff's employment [*10] application for verification; partial verification of the application was completed by the end of May 2002. (*Id.* PP 21 & 23.)

While Plaintiff's application was being processed, Plaintiff timely filed a claim of discrimination with the United States Equal Employment Opportunity Commission ("EEOC") on April 18, 2002. (*Id.* P 22.) In August 2002, the EEOC issued a probable cause determination that Defendant had unreasonably delayed the processing of Plaintiff's application on the basis of her sex. (Aff. of Okoronkwo at Exs. 18 & 19.) Plaintiff received a right to sue letter in January 2003. (Decl. of Niederhoffer at Ex. B.)

By the end of May 2002, Deidra Gilliard had replaced Lozano as Director of the Bronx borough office. (Pl. Local Rule 56.1 Stmt. P 24(c).) Gilliard had stated that upon starting her employment with Defendant that she decided to not proceed automatically with the hiring recommendations made by her predecessor, Lozano, including his recommendation to hire Plaintiff. (Decl. of Deidra Gilliard P 2.) Plaintiff alleges that Gilliard decided "to post William Rivera's position" by email and to "not hire" Plaintiff, despite her understanding that Plaintiff would likely [*11] sue Defendant. (*Id.;* Aff. of Okoronkwo at Ex. 12.) Defendant replies that the email sent by Gilliard refers to an individual named "William Rivera," who is not the same person as "Israel Rivera" and that the position held by William Rivera which Gilliard posted was entirely different from that held by Israel Rivera. (Def. Reply Local Rule 56.1 Stmt. P 24(c); Aff. of Okoronkwo at Ex. 12.)

On May 31, 2002, Defendant sent Plaintiff a letter rejecting her job application. (Pl. Local Rule 56.1 Stmt. P 24(d).) On June 5, 2002, Gilliard reversed course and requested that the Human Resources department proceed with the processing of Plaintiff's application. (*Id.* P 25.) In the early part of June 2002, Williams had forwarded Plaintiff's employment application materials to Donay Queenan, Deputy Director of Human Resources and to Oliva. (Def. Local Rule 56.1 Stmt. P24.) On June 5, 2002, Queenan and Oliva approved Plaintiff's employment application. (*Id.* P 25.) On June 19, 2002, Williams notified Plaintiff that her employment was approved by the Human Resources department and asked her when she would be able to start. (*Id.* P 27.)

During 2001, Plaintiff had worked at Eagle Group [*12] Family Daycare, but was forced to cease that employment in December of 2001 because of problems with her knee. (*Id.* P 9.) At the time that Williams contacted Plaintiff in June 2002 to determine a start date, Defendant claims that Plaintiff advised that she would not be able to commence work because of continuing problems with her knee. (*Id.* PP 28-29.) Plaintiff claims, however,

that despite her knee condition, she could have performed the Community Coordinator job, because the majority of the job involves "paperwork and programming." (Knight Dep. at 44-45.) Plaintiff ultimately began work at Butler in the position of Director of Butler Houses Community Center on September 9, 2002. (Def. Local Rule 56.1 Stmt. P 30.)

Defendant notes that during the period between January 1, 2001 and September 9, 2002, it hired thirty one individuals as "Community Coordinators", fifteen of whom were women. (*Id.* P 31.) Defendant also notes that over the same period of time it promoted fifty six individuals to Community Coordinator positions; women filled thirty seven of those positions. (*Id.*)

II. DISCUSSION

Defendant moves for summary judgment, arguing specifically that Plaintiff has [*13] not established a prima facie case of discrimination and that even if a prima facie case has been established, that Plaintiff cannot show that Defendant's proffered reasons for its actions were pretextual. (Def. Mem. of Law at 1.) Furthermore, Defendant argues that the alternative approach to establishing a claim under Title VII, the mixed-motive theory, has not been established by the Plaintiff. (Def. Mem. of Law in Further Support at 2.) Plaintiff argues that numerous genuine issues of material fact exist which should preclude the granting of Defendants' Motion for Summary Judgment. (Pl. Mem. of Law in Opposition at 10.) Plaintiff has also filed a Cross-motion for Partial Summary Judgment seeking to estop Defendant from disavowing statements and representations made by it in two documents submitted to the EEOC pursuant to 28 U.S.C. § 1746. (Pl. Mem of Law in Support at 1.)

A. The Summary Judgment Standard

The Court's role on a motion for summary judgment is not to resolve disputed issues of fact but to determine whether there are any genuine issues for trial. Summary judgment may be granted only when there are no genuine issues of material fact requiring [*14] a trial and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also* Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); Corselli v. Coughlin, 842 F.2d 23, 25 (2d Cir. 1988). Under Fed. R. Civ. P. 56(c) "[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Supreme Court has held that Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

As a general rule "the court is to draw all factual inferences in favor of the party against whom summary judgment is sought, viewing [*15] the factual assertions . . . in the light most favorable to the party opposing the motion." Rodriguez v. City of New York, 72 F.3d 1051, 1061 (2d Cir. 1995); *see also* Consarc Corp. v. Marine Midland Bank, N.A., 996 F.2d 568, 572 (2d Cir. 1993). As is often stated "[v]iewing the evidence produced in the light most favorable to the nonmovant, if a rational trier could not find for the nonmovant, then there is no genuine issue of material fact and entry of summary judgment is appropriate." Binder v. Long Island Lighting Co., 933 F.2d 187, 191 (2d Cir. 1991). An issue of fact is "material" if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248.

Whether summary judgment is appropriate in a discrimination case depends upon "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered." [2] Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 148-49, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000); *see also* Schnabel v. Abramson, 232 F.3d 83, 90 (2d Cir. 2000) [*16] (holding that "*Reeves* clearly mandates a case-by-case approach, with a court examining the entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff'"). However, where a plaintiff establishes a prima facie case and presents some evidence of pretext, summary judgment may still be appropriate where, for instance, the record conclusively reveals a nondiscriminatory reason for the employer's action, or where the plaintiff creates "only a weak issue of fact" on the issue of pretext and there exists "abundant and uncontroverted independent evidence that no discrimination [has] occurred." Schnabel, 232 F.3d at 90 (quoting Reeves, 530 U.S. at 148) (internal quotations omitted).

> [2] *Reeves* was decided under Fed. R. Civ. P. 50 (not Rule 56 as in the instant case), however "the inquiry under each is the same." Reeves, 530 U.S. at 150.

[*17] The question on a summary judgment motion in a discrimination case is "whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination. To get to the jury, it is not enough . . . to disbelieve the employer; the fact finder must [also] be-

lieve the plaintiff's explanation of intentional discrimination." *Weinstock v. Columbia Univ.,* 224 F.3d 33, 42 (2d Cir. 2000) (quoting *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 519, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993)).

B. Sex Discrimination Under Title VII

Title VII of the Civil Rights Act of 1964 provides, in relevant part:

> It shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex, . . .; or to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's . . . sex.

42 U.S.C. § 2000e-2(a) [*18] . A court's analysis of an unlawful employment discrimination allegation proceeds either according to the familiar burden-shifting framework laid out in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 798, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), or under the so-called mixed motive theory approach.

1. The "Mixed Motive" Theory

In *Price Waterhouse v. Hopkins,* 490 U.S. 228, 258, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989) (plurality opinion), the Supreme Court outlined a burden-shifting framework applicable to mixed motive cases. If the Plaintiff establishes that a prohibited discriminatory factor played a "motivating part" in a challenged employment decision, the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision anyway. The Plaintiff must be able to produce a "smoking gun" or at least a "thick cloud of smoke" to support her allegations of discriminatory treatment in order for the burden to shift to the Defendant. *Raskin v. The Wyatt Company* 125 F.3d 55, 61 (2d Cir. 1997) (quoting *Fields v. New York State Office of Mental Retardation and Developmental Disabilities,* 115 F.3d 116, 124 (2d Cir. 1997). Evidence that calls for [*19] a shift in burden under the *Price Waterhouse* analysis includes policy documents and evidence of statements or actions by decision-makers "that may be viewed as directly reflecting the alleged discriminatory attitude." *Ostrowski v. Atlantic Mut. Ins. Cos.,* 968 F.2d 171, 182 (2d Cir. 1992).

2. The *McDonnell Douglas* Disparate Treatment Theory

Most claims of unlawful employment discrimination under Title VII are analyzed according to the familiar burden-shifting framework laid out in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 798, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). Under *McDonnell Douglas,* the plaintiff bears the initial burden of establishing a prima facie case of discrimination through direct or circumstantial evidence. *Windham v. Time Warner, Inc.,* 275 F.3d 179, 187 (2d Cir. 2001). The plaintiff's burden at this stage is *de minimis,* and the requirement of meeting this burden "is neither onerous, nor intended to be rigid, mechanized or ritualistic." *Abdu-Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 467 (2d Cir. 2001) (internal quotations and citations omitted). To make out a prima facie discrimination claim, a plaintiff [*20] must demonstrate: (1) that he or she is a member of a protected class; (2) that he or she is qualified for the position in question; (3) that he or she suffered an adverse employment action; and that (4) the circumstances surrounding the adverse action give "rise to an inference of discrimination." *Windham,* 275 F.3d at 187 (citation omitted).

A plaintiff who is able to make out a prima facie case establishes a presumption of discrimination and the burden of production shifts to the defendant. *See Woodman,* 411 F.3d at 76. The defendant must meet this burden by articulating a reason for the challenged conduct that "*taken as true,* would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 509, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993) (emphasis in original).

If the defendant is able to present a non-discriminatory explanation for the challenged conduct "the presumption of discrimination drops out" and the burden of proof shifts back to the plaintiff. *Woodman,* 411 F.3d at 76 (citation omitted). The plaintiff must then prove "that the legitimate reasons offered by [*21] the defendant were not its true reasons, but were a pretext for discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000) (quotations and citations omitted). In showing that the employer's explanation was pretextual, the plaintiff need not prove that the explanation offered by the employer was entirely false "but only that its stated reason was not the only reason" and that consideration of an impermissible factor "did make a difference." *Montana v. First Federal Sav. & Loan Ass'n of Rochester,* 869 F.2d 100, 105 (2d Cir. 1989).

C. Plaintiff's Sex Discrimination Claim Under Title VII

1. No genuine issues of material fact

Plaintiff argues that she has brought forth evidence of multiple genuine issues of material fact which would preclude granting Defendant's Motion for Summary Judgment. Furthermore, Plaintiff argues that the facts in the record support a claim under both the mixed motive and the disparate treatment theories of employment discrimination. Having carefully considered the Parties' arguments and their supporting affidavits, declarations and exhibits, the Court finds that there are no genuine issues of material [*22] fact which would justify a trial of Plaintiff's claims.

The dispute over whether the Human Resources department had sole authority to make hiring decisions is not material because Plaintiff need not show that the *ultimate* decision maker based the adverse decision on an impermissible basis. The courts have recognized that "the impermissible bias of a single individual at any stage . . . may taint the ultimate employment decision . . . This is true even absent evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to have the impermissible bias played a meaningful role . . . ." *Bickerstaff v. Vassar College,* 196 F.3d 435, 450 (2d Cir. 1999) (citing *Lam v. Univ. of Hawaii,* 40 F.3d 1551, 1560 (9th Cir. 1994)).

The parties also dispute whether the initial "letter of congratulations" sent to Plaintiff constitutes an employment action. This too is immaterial because there is evidence of other actions against Plaintiff that could constitute an "adverse employment action." An "adverse employment action" under Title VII is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities. [*23] *Feingold v. New York,* 366 F.3d 138 (2d Cir. 2004). Either the initial rejection letter sent to Plaintiff in May 2002 or the delayed hiring of Plaintiff could constitute "adverse employment actions" since both were more than a mere inconvenience or alteration of job responsibilities. At the least, they were outright denials of employment for a limited period of time. Either could satisfy the "adverse employment action" requirement of the *McDonnell Douglas* prima facie case. It is therefore unnecessary to resolve the dispute over whether the congratulatory letter is an adverse action.

A third contested issue deals with Rivera and whether he was selected over Plaintiff for the position of Community Coordinator. Plaintiff argues that Rivera was placed in the position that was "earmarked" for Plaintiff. Defendant concedes that Rivera was sent to Butler and did occupy the only "Community Coordinator" budgetary line that was available at that facility during the time period relevant to this dispute. Evidence that a person who is not in the plaintiff's protected class was selected to receive some employment benefit over the plaintiff would provide an inference of discrimination [*24] under the fourth prong of the prima facie case. See *Chertkova v. Conn. Gen. Life Ins. Co.,* 92 F.3d 81, 91 (2d Cir. 1996) (citing *Washington v. Garrett,* 10 F.3d 1421, 1434 (9th Cir. 1993)). However, it is clear from the record that Rivera was not actually selected over Plaintiff and so there is no genuine issue of material fact in this regard.

Despite holding the title of "Community Coordinator," Rivera apparently did not supervise employees or conduct any of the type of work that would be required of an employee that held the functional position sought by Plaintiff. Moreover, Rivera's own declarations and testimony supports the claim that he was placed at Butler on a temporary basis to oversee repair work at the facility. That Rivera was subsequently transferred to Soundview Senior Center in December 2001 provides further support that his assignment to Butler was temporary and was not meant to be a permanent selection of Rivera over Plaintiff.

Finally, the parties dispute the role of Figueroa in the hiring process. Although Figueroa is a lower level employee, it is clear from the record that she did participate in the decision making process. She [*25] interviewed Plaintiff and made recommendations to her superiors supporting Plaintiff's employment application. Although Figueroa's was not the last word in the decision to hire Plaintiff, as noted above, impermissible bias can come from any party involved in the decision making process. And it is undisputed that Figueroa played a role in the selection process.

2. Defendant is entitled to a judgment as a matter of law

The facts on the record conclusively establish that Plaintiff will be unable to carry her burden under either the mixed motive or the disparate treatment theories of employment discrimination.

Plaintiff's testimony is the only evidence on the record directly ascribing discriminatory intent to Figueroa and Defendant and it consists largely of her uncorroborated accounts of what Figueroa allegedly said on one occasion. The alleged statement could raise a genuine issue of fact as to defendant's intent. See *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 78 (2d Cir. 2001). Courts have held that "the discriminatory animus of intermediate supervisors who have input in the decision making process will not give rise to liability if the supervisor with final authority [*26] bases an adverse employment action exclusively on an independent evaluation. But the employer will be liable 'where the decision maker 'rubber stamps' the . . . recommendation of the subordinates; in

such cases . . . the decision maker acts as a conduit of the subordinates' improper motive.'" *Fullard v. City of New York,* 274 F. Supp.2d 347, 357 (S.D.N.Y. 2003) (quoting *Mato v. Baldauf,* 267 F.3d 444, 450 (5th Cir. 2001)).

The record clearly shows that Lozano had made an employment decision regarding Plaintiff for the position as early as August 23, 2000, well before Plaintiff's interview with Figueroa in March 2001. Gilliard's decision initially to not pursue Lozano's recommendations also appears to be clearly independent of Figueroa's allegedly discriminatory intent, since she took over nearly a year after the statements were allegedly made and there was no evidence at all in the record that Gilliard interacted with Figueroa in making her decision. The fact that Gilliard mentioned in an email she sent to Queenan the possibility that Plaintiff might sue if she was not ultimately hired does not on its face indicate any sort of discriminatory intent. [*27] Furthermore, Plaintiff had filed her complaint with the EEOC on April 18, 2002. (Aff. of Okoronkwo at Ex. 8.) Gilliard's May 29, 2002 email to Queenan was an eminently reasonable inquiry in light of the fact that Plaintiff had already clearly indicated that she might file a lawsuit. The record simply contains no evidence that Lozano or Gilliard served as mere conduits of Figueroa's allegedly improper motive.

There is no evidence that the alleged statements made by Figueroa actually tainted the employment decision ultimately reached nor is there any persuasive evidence that Rivera was selected over Plaintiff for the Community Coordinator position. Plaintiff has therefore failed to establish an inference of discrimination that would support the fourth prong of a prima facie discrimination case under the *McDonnell Douglas* framework. Even if Figueroa's stray remark - allegedly evidencing animus against Plaintiff's sex - could support an inference of discrimination, Defendant has brought forth evidence of legitimate, non-discriminatory reason for its actions that have not been rebutted by Plaintiff. Defendant has amply demonstrated that the delay in hiring Plaintiff was due to the [*28] lack of an additional budget line for the Community Coordinator position at Butler. Moreover, it is apparent from the record that the initial decision by Gilliard to not immediately approve Plaintiff's employment application was based on her legitimate, non-discriminatory judgment to not automatically adopt her predecessor's hiring decisions. Plaintiff has not brought forth any evidence that the foregoing reasons offered by Defendant to explain the delay in hiring her were merely pretextual. Beyond mere speculation and conclusory allegations, Plaintiff has failed to establish that her sex was a substantial factor in the delay in processing her employment application. Finally, Defendant's evidence, undisputed by Plaintiff, that it has generally hired women at favorable rates in comparison with men during the period relevant to this dispute demonstrates that Plaintiff would not be able to prevail on a "mixed motive" theory of discrimination either. Even if true, Figueroa's alleged remark is insufficient to constitute a "smoking gun" or a "thick cloud of smoke". *See Raskin,* 125 F.3d at 61.

Accordingly, Defendant's Motion for Summary Judgment on Plaintiff's Title VII [*29] claim is GRANTED.

D. State and Local Claims

The same standards that apply to Title VII employment discrimination claims are applicable to claims brought under the New York Human Rights Law and New York City Administrative Code. *See Mark v. The Mount Sinai Hospital,* 85 F. Supp.2d 252 (S.D.N.Y. 2000); *James v. New York Racing Ass'n,* 233 F.3d 149, 153 (2d Cir. 2000). Since Defendant is entitled to summary judgment on Plaintiff's Title VII claim, it is likewise entitled to summary judgment on the state and local claims. Accordingly, Defendant's Motion for Summary Judgment on Plaintiff's state and local claims is GRANTED.

E. Plaintiff's Cross-Motion Regarding the EEOC's Investigation

Plaintiff has cross-filed for Partial Summary Judgment seeking to estop the Defendant from denying statements it made during the course of an investigation by the EEOC and that it submitted to the EEOC pursuant to 28 U.S.C. § 1746. It is well settled that EEOC findings in a particular matter are not binding on the courts. An EEOC "probable cause" determination is not a final judgment. Indeed, in *McDonnell Douglas* the court noted that where the commission [*30] has *not* found reasonable cause a district court is not prevented from reviewing the lawsuit in its entirety:

> The Commission itself does not consider the absence of a "reasonable cause" determination as providing employer immunity from similar charges in a federal court . . . and the courts of appeal have held that, in view of the large volume of complaints before the Commission and the non-adversary character of many of its proceedings, court actions under Title VII are de novo proceedings and . . . a Commission "no reasonable cause" finding does not bar a lawsuit in the case.

*McDonnell Douglas,* 411 U.S. at 799. The same holds true if the EEOC has issued a reasonable cause determi-

nation, as it did in this case. Since this Court reviews Title VII proceedings *de novo,* neither the EEOC's findings nor the underlying facts supporting such findings are binding on it. Therefore, Plaintiff may not estop Defendant from denying statements made during the course of EEOC investigations. Accordingly, Plaintiff's Cross-motion for Partial Summary Judgment is DENIED.

III. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED [*31] in its entirety. Plaintiff's Cross-motion for Partial Summary Judgment is DENIED. The Clerk of Court is directed to close the docket for this case.

SO ORDERED.

Dated: New York, New York

January 31, 2007

Deborah A. Batts

United States District Judge