# EXHIBIT C

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2
     ------------------------------------------X
 3
     ESTER LORUSSO,
 4
                    Plaintiff,
 5
                                         Case No.
 6                                       07CV3583 (LBS)(RLE)
           -against-
 7
     ALITALIA-LINEE AEREE ITALIANE SpA
 8
                    Defendant.
 9
     ------------------------------------------X
10
11
12
13
14         Videotaped Deposition of Ester Lorusso
15              December 19, 2007
16              New York, New York
17
18
19
20
21
22
23   REPORTED BY:
24   Helen Mendlowich
25
```

One Penn Plaza, NYC                    Toby Feldman, Inc.                 tel (212) 244.3990
email@tobyfeldman.com        NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS  tel (800) 246.4950

Page 46

LORUSSO

Q. Maybe to save time, is that true as well for contempt for females and homosexuals, that you can't recall any specific instances that Mr. Gallo gave you?

A. No. They were just general statements that he would make, but I don't remember the specific instances.

Q. Do you believe he made those statements more than once to you?

A. Yes.

Q. Did he ever put a statement like this in writing that you have seen?

A. No.

Q. Did Mr. Gallo indicate to you that he had ever protested anything that he regarded as expressions by leaders of the company of contempt for older employees, females or homosexuals?

A. Yes.

Q. What do you recall him telling you about his protesting?

A. Specifically to discriminating against me at the time it was happening. I believe he told Libutti that it was unlawful to discriminate against female employees in the United States.

Page 47

LORUSSO

Q. When did Mr. Gallo tell you that he told Libutti that it was unlawful to discriminate against female employees in the United States in connection with your situation?

A. I don't remember.

Q. Can you recall what position you were in at the time that Mr. Gallo says that he said this to Libutti?

A. No.

Q. Can you recall what the details of the discrimination were that Mr. Gallo was supposedly protesting to Libutti?

A. Yes. That my job was being given to a male employee.

Q. And is that male employee Tim O'Neill?

A. Yes.

Q. Tim O'Neill had been the head of Italia Tours?

A. Yes, years back.

Q. And then Tim O'Neill came back to Alitalia in the Passenger Division?

A. Yes.

Q. What was his title?

A. I believe it was director of alliances.

Page 48

LORUSSO

Q. Wasn't it director of sales and alliances?

A. That could be, yes.

Q. Do you know when Tim O'Neill came back to Alitalia in that capacity?

A. It was either 2003 or 2004. 2003, I think. 2003, I believe.

Q. Had you held that position of director of sales and alliances?

A. No.

Q. So Tim O'Neill wasn't taking that position away from you when he got it?

A. No.

Q. When was Tim O'Neill given your position?

A. It was throughout the time that our boss was Guilio Libutti.

Q. Mr. Libutti came in the summer of 2003; is that correct?

A. I believe so.

Q. So starting when Mr. Libutti came and continuing onward Mr. Libutti was giving your responsibilities to Tim O'Neill?

A. Slowly, yes.

Q. You say that Mr. Gallo told you that he told Mr. Libutti that this was sex discrimination

Page 49

LORUSSO

and that it was illegal in the U.S.?

A. I'm sorry, repeat your question.

(Testimony was read back.)

A. Yes.

Q. Yes is the answer.

You probably answered this but now that we are talking about it, can you recall approximately when Mr. Gallo told you that he told this to Libutti?

A. I don't recall.

Q. You don't recall when Gallo told you?

A. Right.

Q. Do you know if Gallo told you when he told this to Libutti?

A. Do I recall --

Q. Well, he could have said it in 2003, apparently, he could have said it in 2004. Libutti was there until 2006.

Do you have any idea when Gallo said to Libutti, this is sex discrimination, it's illegal?

A. It had to have been after I first made a complaint.

Q. Would that be around September of 2004?

A. That would be in the summer of 2004.

13 (Pages 46 to 49)

One Penn Plaza, NYC          Toby Feldman, Inc.                    tel (212) 244.3990
email@tobyfeldman.com    NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS   tel (800) 246.4950

Page 126

LORUSSO

employed, at the time.
Q. But first answer my question which has to do, Mr. Libutti have anything to do with the Cargo department?
A. No.
Q. Do you know if Mr. Libutti was the person who arranged for you to get a job in the Cargo department in 2006?
A. No.
Q. Do you know whether he had any influence on that placement, I'll call it, or on that job opportunity?
A. I don't know.
Q. As you mentioned, Mr. Libutti was, in fact, no longer employed at Alitalia at the time of your termination, correct?
A. That is correct. I believe that's correct.
Q. He certainly was no longer in New York at the time, correct?
A. Right.
Q. You said earlier that Mr. Libutti said — I don't want to put words in your mouth — but essentially set in motion the chain of events that

Page 127

LORUSSO

led to your termination?
A. That's correct.
Q. What are you referring to specifically?
A. Mr. Libutti step-by-step was taking away my responsibilities and giving them to my male counterpart.
Q. You mean Tim O'Neill?
A. Tim O'Neill.
Q. And so you consider that is how Mr. Libutti —
A. — began —
Q. — began the process of your termination?
A. Correct.
Q. The first thing he did was to promote you to GA2000, correct?
MS. KURZON: Objection to the term "promote." Transferred?
Q. Weren't you promoted to GA2000?
A. I was transferred to GA2000.
Q. What was your salary before you went to GA2000?
A. Eighty thousand.
Q. What was your salary when you were at GA2000?

Page 128

LORUSSO

A. A hundred and five.
Q. So you had a salary increase of more than 25 percent when you went to GA2000?
A. Right. The salary increase came by way of my refusing to go to GA2000, and Libutti would come back with a higher amount in order to entice me to go to GA2000.
Q. What was your title at GA2000?
A. Managing director.
Q. What was your title before you went to GA2000?
A. Director of managing.
Q. Is a managing director higher than a director?
A. Managing director of a sinking ship is not higher than a director of marketing in a company that was sound.
Q. But you were managing director at GA2000, correct?
A. Yes, I was.
Q. And you were just a director when you were in Passenger?
A. Yes, I was.
Q. Your salary was 80,000?

Page 129

LORUSSO

A. That's correct.
Q. And went up to 105,000?
A. That's correct.
Q. Did Mr. Libutti tell you that GA2000 was a sinking ship?
A. Everyone knew it was a sinking ship.
Q. The question is whether Mr. Libutti did?
A. No. He did not.
Q. Did Mr. Gallo say so?
A. No. He did not.
Q. Did anybody say so specifically?
A. I don't believe so.
Q. But it was sort of common knowledge?
A. It was common knowledge that Alitalia was closing companies, subsidiary companies that it owned.
Q. Okay. And GA2000 was a subsidiary company?
A. Yes, it was.
Q. So the conclusion was that it might be on the list, so to speak, of things to be closed?
A. That's correct.
Q. I believe that you claimed that you made a profit when you were at GA2000.

33 (Pages 126 to 129)

One Penn Plaza, NYC            Toby Feldman, Inc.                 tel (212) 244.3990
email@tobyfeldman.com    NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS   tel (800) 246.4950

Page 190

LORUSSO

A. No, not my notes. Perhaps your notes.
Q. Oh, we've given you what we have.
    You think that Mr. — somebody told you, you don't remember who, that Mr. Pausini changed the review?
A. Yes. I believe he came to New York to do it.
Q. He came to New York to change the review?
A. Yes. One of the reasons why he was in New York.
Q. Because he had already been transferred back to Rome?
A. Yes.
Q. And Mr. Libutti was in charge here, correct?
A. Yes.
Q. Paragraph 18 says that "Mr. Libutti was immediately dismissive of plaintiff."
    In what ways was Mr. Libutti dismissive of you immediately?
A. He basically wanted to know about our advertising practices and made it clear to me that that wasn't the way things should be done.
Q. Okay. Can you think of any specific

Page 191

LORUSSO

examples where he didn't like the way things were being done?
A. I can't think of anything specific right now.
Q. Did Mr. Libutti continue during the time he remained as director in marketing in the Passenger Division that he didn't like the way the advertising was being done?
A. Excuse me?
Q. Did Mr. Libutti continue to make it clear to you that he didn't like the way the advertising was being done as long as you remained in Passenger?
A. Mr. Libutti was negative about anything that had to do with me, so it's hard to pinpoint whether he continued or he didn't continue.
Q. Did he continue, for example, to criticize the advertising?
A. He didn't continue to criticize the advertising. He would continue to criticize anything I had to do.
Q. Well, advertising was a big —
A. With the advertising.
Q. Advertising was a big part of what you did, correct?

Page 192

LORUSSO

A. Yes.
Q. So he didn't criticize the advertising —
A. In other words, he came to the States and said, This is the way we used to do it in Argentina. This is the way it should be done. This is the way we did it in Argentina.
Q. Did you change the way you were doing things to conform to what Mr. Libutti wanted?
A. I think I tried to appease him with certain things, yes.
Q. With certain things?
A. Yes.
Q. But he continued to feel that he wanted it done differently?
A. Yes.
Q. Paragraph 18 continues, "He made it clear that women" — clear to you, I'm sorry — "that women were not meant to serve in executive capacities."
    How did he do that?
A. By taking parts of my job away and giving them to Tim O'Neill.
Q. What parts were those?
A. Yearly sales meeting.

Page 193

LORUSSO

Q. You used to run a yearly sales meeting?
A. The organization of the yearly sales meeting, yes.
Q. You organized it?
A. Yes.
Q. Whom did he give that to?
A. Tim O'Neill.
Q. Who?
A. Tim O'Neill.
Q. Tim O'Neill, who was in sales?
A. Who was a fellow director.
Q. Tim O'Neill's title was sales and alliance —
A. — coordination.
Q. — coordination?
A. That's correct.
Q. The alliance referred to, by the way, just so we were clear, that's the Sky Team alliance with Delta and other airlines?
A. That's correct.
Q. Air France, I think.
    Other than taking some of your responsibilities away, such as the yearly sales meeting, how else did he make it clear to you that

49 (Pages 190 to 193)

One Penn Plaza, NYC                Toby Feldman, Inc.                   tel (212) 244.3990
email@tobyfeldman.com    NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS    tel (800) 246.4950

Page 194

```
                         LORUSSO
 1  women didn't belong in executive positions?
 2      A.  By giving me menial tasks.
 3      Q.  Mr. Libutti gave you menial tasks?
 4      A.  Yes.
 5      Q.  Such as?
 6      A.  I recall one day he came in with shopping
 7  bags full of his home videos that he wanted
 8  transferred to DVDs.
 9      Q.  Yes?
10      A.  And he handed them to me so that I could
11  get them done for him.
12      Q.  So that you could get them done for him
13  where?
14      A.  At our ad agency.
15      Q.  So it was the ad agency would did that,
16  correct?
17      A.  They expected them to do that.
18      Q.  He didn't ask you to do it.
19      A.  He asked me to ask them to do it.
20      Q.  And you were the liaison to the ad agency.
21  Wasn't that your principal job?
22      A.  Yes. At no cost, I might add.
23      Q.  Okay. The ad agency refused?
24      A.  I don't know what happened because I gave
```

Page 195

```
                         LORUSSO
 1  the bag — I felt that I was in a compromising
 2  position because I was the liaison to the ad agency.
 3  So I handed the shopping bags to his secretary, to
 4  his assistant, and I asked her to follow up on it.
 5      Q.  You told her to follow up on it?
 6      A.  I asked her to.
 7      Q.  You didn't do what Mr. Libutti asked, you
 8  told his secretary to do what Mr. Libutti asked?
 9      A.  Mr. Libutti was asking me to do something
10  that was personal in nature and not business
11  oriented and he was asking me to do it without being
12  charged. So I really felt that I would be
13  compromising my position as the liaison between the
14  agency and Alitalia.
15      Q.  Did you tell that to Mr. Libutti's
16  secretary?
17      A.  What do you mean?
18      Q.  Did you say to her, You better do this
19  because I feel my position would be compromised if I
20  give this to the ad agency?
21      A.  I believe I did.
22      Q.  Did you say it to Mr. Libutti?
23      A.  I don't recall.
24      Q.  Going back to ways in which he made it
```

Page 196

```
                         LORUSSO
 1  clear to you that women were not meant to serve in
 2  executive capacities. You said, one, he transferred
 3  responsibilities away from you, one of it was the
 4  sales meeting. What else?
 5      A.  We had a yearly symposium which my
 6  department organized. He also gave that to Tim
 7  O'Neill.
 8      Q.  Who in your department did the organizing
 9  of that?
10      A.  Elizabeth Santella.
11      Q.  Elizabeth Santella?
12      A.  Yes.
13      Q.  What was her title at the time?
14      A.  I believe it was sales promotion manager.
15      Q.  Did Elizabeth —
16      A.  — or marketing communications manager. I
17  don't recall at the time.
18      Q.  Did he transfer Elizabeth Santella to
19  report to Tim O'Neill at that time?
20      A.  No.
21      Q.  What else did he take away from you?
22      A.  The marketing component of the sales team
23  alliance. I used to handle that and then he wanted
24  Tim O'Neill to handle that.
```

Page 197

```
                         LORUSSO
 1      Q.  When you say, "the sales team," you mean
 2  the Sky Team alliance?
 3      A.  I'm sorry, the Sky Team alliance.
 4      Q.  So Tim started handling the marketing
 5  component of Sky Team?
 6      A.  Yes.
 7      Q.  How much of your job did that involve?
 8      A.  I would say about 15 percent.
 9      Q.  Anything else you can think of that was
10  transferred?
11      A.  No, but I did write to Libutti all of the
12  items that he was — that concerned us.
13      Q.  Okay. You complained about this to
14  Libutti?
15      A.  Yes, I did.
16      Q.  What's your basis for thinking it was
17  because you're a woman that he transferred these
18  things to Tim O'Neill? Do you have a basis for it?
19      A.  I was the only woman, female director.
20      Q.  Any other reason?
21      A.  Probably that's because Libutti came with
22  the reputation of, you know, treating women as —
23  not treating women well.
24      Q.  He came with that reputation?
```

50 (Pages 194 to 197)

Page 198

```
 1                    LORUSSO
 2      A.  He came from South America with that
 3  reputation.
 4      Q.  He came from the Buenos Aires office?
 5      A.  That's correct.
 6      Q.  And you heard from the people in the
 7  Buenos Aires office that Guilio Libutti didn't treat
 8  them well?
 9      A.  I didn't hear from them directly, but
10  indirectly, I did.
11      Q.  What does "indirectly" mean in this case?
12      A.  When someone comes to an office, there is
13  gossip that surrounds it about what this person was
14  like in his other office and so on and so forth.  I
15  don't remember specific statements.
16      Q.  You said that you were the only female
17  director but at this time Martha Lotti was a
18  director, wasn't she?
19      A.  Martha Lotti was a director.  She was
20  reporting to the Rome office.  I don't remember when
21  she began reporting to Libutti.  She was in a
22  totally separate division.
23      Q.  But she was at some point reporting to
24  Libutti?
25      A.  Yes.
```

Page 199

```
 1                    LORUSSO
 2      Q.  And Libutti was the head of everything in
 3  North America, correct?
 4      A.  Yes.
 5      Q.  Do you know if he transferred any of her
 6  responsibilities away from her?
 7      A.  I don't know.
 8      Q.  When was that symposium transferred over
 9  to Tim O'Neill.
10      A.  I don't remember the exact date.
11      Q.  Are you sure you were not in GA2000 by
12  then?
13      A.  I'm positive.
14      Q.  You're positive?
15      A.  Yes.
16      Q.  Did Mr. Libutti ever tell you that he
17  didn't think women should serve in executive
18  capacities?
19      A.  No.
20      Q.  Did anybody ever tell you that Mr.
21  Libutti had actually said that?
22      A.  I don't recall.
23          MS. KURZON:  At any time up until the
24      present, today, or while she was still
25      employed?
```

Page 200

```
 1                    LORUSSO
 2          MR. KORAL:  Any time.
 3      A.  Well, up until the present, I have already
 4  told you that Franco Gallo said it to me.
 5      Q.  I don't believe that you told me that
 6  Franco Gallo actually said that Libutti said that
 7  women shouldn't be executives.  I think you told me
 8  that Franco Gallo said that Libutti had made
 9  denigrating remarks about women.
10      A.  That's correct.
11      Q.  Is that one of the remarks that Gallo
12  actually said he made?
13      A.  No.  You are correct.
14      Q.  Gallo wasn't quoting him?
15      A.  Correct.
16          MS. KURZON:  I believe she actually
17      testified that Gallo said that Libutti does not
18      allow women to be in high positions, or
19      something to that effect.
20          MR. KORAL:  Well, the record will reflect
21      what she testified.
22      Q.  Paragraph 19 says that you were not
23  "informed of numerous essential meetings regarding
24  marketing and communications."
25          What meetings regarding marketing
```

Page 201

```
 1                    LORUSSO
 2  communications did Mr. Libutti hold that you were
 3  not aware of?
 4      A.  I don't have the exact meetings right now,
 5  or the dates, but I can refer to notes, if you allow
 6  me to.
 7      Q.  I think that's not a good idea.  I should
 8  say, if you want to, go ahead and have a look at
 9  them, but your attorney is going to stop you in a
10  heartbeat, believe me?
11          MS. KURZON:  She is not in the possession
12      of any notes, so I don't know what notes she's
13      referring to.
14      A.  Meaning —
15      Q.  Let me ask you, do you have notes with
16  you?
17      A.  No.
18      Q.  These are notes somewhere else?
19          MS. KURZON:  Are you talking about notes
20      that have already been provided?
21          THE WITNESS:  Yes, of course.
22      Q.  These are notes that you gave to your
23  attorneys?
24      A.  Yes.
25      Q.  And that you assume your attorneys have
```

51 (Pages 198 to 201)

One Penn Plaza, NYC                    Toby Feldman, Inc.                        tel (212) 244.3990
email@tobyfeldman.com       NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS          tel (800) 246.4950

Page 202

```
 1              LORUSSO
 2   passed on to us?
 3       A.   Yes, of course.
 4           MS. KURZON: Or notes that you reviewed
 5       because they've been produced by Alitalia?
 6           THE WITNESS: Of course.
 7       Q.   In paragraph 20 you say that he "shifted
 8   duties to a less experienced male colleague."
 9           Who was that? Was that Tim O'Neill?
10       A.   Yes, it is.
11       Q.   Less experienced in what way?
12       A.   In marketing.
13       Q.   What's Tim O'Neill's background? Sales?
14       A.   Yes.
15       Q.   Tim O'Neill is approximately your age or a
16   little older?
17       A.   A little older.
18       Q.   Do you know if he came to the travel
19   industry, the airline industry late in life?
20       A.   No.
21       Q.   As far as you know, that's what he's
22   always done?
23       A.   Yes.
24       Q.   What tasks were given to Francesca Forte
25   as alleged in paragraph 22?
```

Page 203

```
 1              LORUSSO
 2       A.   Francesca Forte was given the
 3   responsibility of advertising.
 4       Q.   Francesca Forte got the responsibilities
 5   of advertising?
 6       A.   Yes.
 7       Q.   What was her position prior to your
 8   transfer to GA2000?
 9       A.   I don't remember her title, but she
10   reported to me.
11       Q.   Was she a manager?
12       A.   No.
13       Q.   She was an administrative assistant?
14       A.   I think her title had representative in
15   it, the word "representative."
16       Q.   And she got the same responsibilities for
17   advertising that you had had?
18       A.   Yes, she did. My work was split up.
19       Q.   Isn't it true that advertising was moved
20   to Rome at this time, in 2004?
21       A.   Actually, it was supposed to have been
22   moved to Rome, but I believe that first Francesca
23   Forte was working on it in New York and then she was
24   transferred along with the responsibility. She was
25   transferred to Rome.
```

Page 204

```
 1              LORUSSO
 2       Q.   Do you know when that occurred?
 3       A.   I don't remember at this time.
 4       Q.   Were you still at GA2000 when she was
 5   transferred to Rome?
 6       A.   I believe so.
 7       Q.   Had you just begun in GA2000 when she was
 8   transferred to Rome?
 9       A.   I don't remember.
10       Q.   And, as you said, they split up your
11   responsibilities and gave them to different people?
12       A.   Yes.
13       Q.   Anybody besides Tim O'Neill and Francesca
14   Forte?
15       A.   I believe Lisa Del Percio was doing a few
16   things, and she was --
17       Q.   Lisa, L-I-S-A?
18       A.   Yes.
19       Q.   Del Persio.
20           Do you recall anything specific that Lisa
21   was doing that you had done?
22       A.   That my department had done? She was
23   handling barter, promotional barter.
24       Q.   Was she a manager?
25       A.   No.
```

Page 205

```
 1              LORUSSO
 2       Q.   Had she been doing that before you went to
 3   GA2000, under your supervision, I mean?
 4       A.   No, no. She reported directly to Libutti.
 5   She was his assistant.
 6       Q.   She was this assistant?
 7       A.   Yes.
 8       Q.   His administrative assistant?
 9       A.   Yes.
10       Q.   So she got the administrative barter --
11   pardon me, the promotional barter?
12       A.   Yes.
13       Q.   Can you think of anybody else that got
14   some of your responsibilities?
15       A.   Not at this time.
16       Q.   Paragraph 24 states that you knew that
17   GA2000 would soon close. Your testimony earlier was
18   that you were concerned that it might close because
19   Alitalia was closing subsidiaries.
20           Did you have any specific knowledge that
21   it would close or does "knew" here mean really
22   suspected?
23       A.   I suspected.
24       Q.   You feared it?
25       A.   I feared it.
```

52 (Pages 202 to 205)

Page 254

```
 1                 LORUSSO
 2    A.  Yes.
 3    Q.  D'Ilario, you are talking about really his
 4  whole package including his ex-pat —
 5    A.  His compensation.
 6    Q.  — his ex-pat benefits plus his salary?
 7    A.  His compensation, his total compensation.
 8    Q.  Which consists of ex-pat benefits plus
 9  salary.
10    A.  Call it what you will.
11    Q.  Well, do you disagree with that?
12    A.  No.
13    Q.  Do you know what Mr. O'Neill's salary was?
14    A.  Exactly? No, but I'm sure it was higher
15  than mine.
16    Q.  Do you know what Mr. Mariotti's was?
17    A.  I don't remember.
18    Q.  Do you remember what yours was in August
19  of 2004?
20    A.  I believe it was $80,000.
21    Q.  You believe that O'Neill's was higher and
22  you believe that Mariotti's was higher?
23    A.  Correct.
24    Q.  And you believe that the whole value of
25  Mr. D'Ilario's compensation package was higher?
```

Page 255

```
 1                 LORUSSO
 2    A.  That's correct.
 3    Q.  Did you hear back from Mr. Sciarresi
 4  regarding this e-mail?
 5    A.  I don't recall.
 6    Q.  You did eventually have a conversation
 7  with Franco Gallo and Stephanie Di Clemente about
 8  it?
 9    A.  Yes, I did.
10    Q.  When you were in the Cargo Division, do
11  you know what your salary was relative to that of
12  Mr. Baxtrum and Mr. Guidotti?
13    A.  No, I don't.
14    Q.  So you don't know whether yours was higher
15  or lower than theirs?
16    A.  No, I don't.
17         MR. KORAL: Let's move on. We'll mark as
18  Defendant's Exhibit 6 a letter signed by Mr.
19  Scerasi and Mr. Libutti dated September 1, 2004
20  and stamped September, I believe it's 22, 2004.
21         MS. KURZON: May I have a copy, please?
22         MR. KORAL: I'm sorry.
23  It's stamped September 2, 2004. To you.
24         (Defendant's Exhibit 6, letter, was marked
25  for identification as of this date.)
```

Page 256

```
 1                 LORUSSO
 2    Q.  Did you discuss this letter with Mr.
 3  Libutti and Mr. Sciarresi at any time?
 4    A.  I don't recall.
 5    Q.  There are two CC's on this letter. One is
 6  to TYNYC and one is to UGNYC.
 7         Do you know what those stand for?
 8    A.  I don't recall.
 9    Q.  Do you recall receiving this letter?
10    A.  Yes, I do.
11    Q.  You did not regard this as a promotion, as
12  you've testified earlier.
13    A.  No. It was a transfer.
14    Q.  But you don't dispute that you were called
15  managing director, do you?
16    A.  No, I don't.
17    Q.  And you don't dispute that your salary was
18  increased from $78,520.80 to $105,000 per annum?
19    A.  That's correct.
20    Q.  Correct?
21    A.  Yes.
22    Q.  And you continued on all the Alitalia
23  benefits, correct?
24    A.  Correct.
25    Q.  Did the GA2000 other employees besides you
```

Page 257

```
 1                 LORUSSO
 2  and Mr. Farrow continue on Alitalia benefits?
 3    A.  No. Nor did they start on Alitalia
 4  benefits.
 5    Q.  "Continue" was the wrong word.
 6         Did they ever get Alitalia benefits?
 7    A.  No.
 8         MR. KORAL: Let's look at a document we'll
 9  mark Defendant's Exhibit 7 from you to Andrea
10  Sciarresi dated September 1.
11         MS. KURZON: September 1, 2004.
12         MR. KORAL: 2004.
13         (Defendant's Exhibit 7, document, was
14  marked for identification as of this date.)
15    Q.  Do you recall sending this to Mr.
16  Sciarresi?
17    A.  Yes, I do.
18    Q.  And you copied Mr. Libutti?
19    A.  Yes, I did.
20    Q.  You hadn't copied him on the letter we
21  just looked at, which was Exhibit 6, I believe.
22         Is there a reason why you didn't?
23         MS. KURZON: He signed it.
24         MR. KORAL: Not 6, 5. The other e-mail to
25  Sciarresi.
```

65 (Pages 254 to 257)

One Penn Plaza, NYC                Toby Feldman, Inc.                    tel (212) 244.3990
email@tobyfeldman.com     NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS    tel (800) 246.4950

Ester Lorusso					12/19/2007

Page 234

    LORUSSO
1  
2  work. I think you testified that was the
3  advertising.
4     A. Yes.
5     Q. Do you know if Francesca Forte ever ran an
6  advertising campaign?
7        MS. KURZON: Prior to being given --
8        MR. KORAL: No.
9     Q. After being given these responsibilities,
10 did she ever run an advertising campaign?
11    A. I don't know.
12    Q. Wasn't all advertising at that point being
13 done in Rome? And by "done" I mean created and
14 handled by Rome.
15    A. I don't know.
16    Q. I think you already testified that she was
17 transferred to Rome eventually.
18    A. Yes.
19    Q. Sometime after the summer of 2005?
20    A. I don't recall.
21    Q. When Francesca Forte reported to you, what
22 did she do? What were her responsibilities?
23      I know you said you don't remember her
24 title. Do you remember what her responsibilities
25 were?

Page 235

    LORUSSO
1
2     A. A lot of the work that Elizabeth and
3  Francesca did overlapped, so I don't remember
4  specifically what Francesca was doing.
5     Q. That's Elizabeth Santella?
6     A. Yes.
7     Q. Did it have something to do with
8  advertising?
9     A. Yes.
10    Q. To whom did Francesca report after you
11 went to GA2000?
12    A. To Guilio Libutti.
13    Q. She reported directly to Guilio?
14    A. I believe so.
15    Q. Who, if anybody, until the summer of 2005,
16 was handling advertising? Was Mr. Libutti doing
17 that himself?
18    A. I don't remember.
19    Q. Okay. You state at the top of page 5 that
20 you had several meetings with Gallo and Libutti
21 about a possible severance package.
22      Who initiated those conversations?
23    A. I don't recall.
24    Q. You state that Mr. Libutti offered you two
25 years' salary, lifetime airline ticket benefits and

Page 236

    LORUSSO
1
2  medical benefits, but that you rejected the offer.
3        My first question is: Did he make this
4  offer in writing?
5     A. No.
6     Q. Were any of these negotiations I'll call
7  them about possible severance package done in
8  writing?
9     A. No.
10    Q. So these were all just conversations with
11 Libutti and Gallo?
12    A. Correct.
13    Q. But it was Libutti who offered the two
14 years?
15    A. Yes.
16    Q. Did he offer it to you as a solid offer or
17 did he say he would try to get it for you?
18    A. I don't recall.
19    Q. You say you rejected the offer because you
20 wanted to continue working; is that right?
21    A. Yes, sir.
22    Q. Now, you had already been looking for jobs
23 according to this.
24    A. Yes.
25    Q. And you had not been coming up with any?

Page 237

    LORUSSO
1
2     A. No.
3     Q. Because of your age and your level?
4     A. I believe so.
5     Q. Did the headhunters tell you that?
6     A. No.
7     Q. They did not say, Oh, you're too old to
8  get a job. You've got to stay where you are, alone
9  on the 36th floor.
10       They did not say something like that?
11    A. No. Not that I recall.
12    Q. Once you were in Cargo, what were your
13 activities? What jobs, tasks did you perform?
14    A. It wasn't clear.
15    Q. Okay. It states here, third paragraph
16 from the bottom on page 5 you began working on an
17 e-mail database.
18       Was that assigned to you?
19    A. No. It was not.
20    Q. It was something that you saw a need for
21 and decided to develop?
22    A. That is correct.
23    Q. In fact, it was to be a Cargo contacts
24 directory, wasn't it? Wasn't that what you
25 envisioned?

60 (Pages 234 to 237)

Ester Lorusso                                                                    12/19/2007

Page 238

LORUSSO
   A.   Clients directory. Yes, a client
database.
   Q.   And you distributed drafts of it at
different time to various managers and directors in
Cargo and asked them for input?
   A.   Yes.
   Q.   And you got that input from them?
   A.   Yes.
   Q.   You also put together newsletters?
   A.   Yes.
   Q.   And also, didn't you develop fliers?
   A.   Yes, I did.
   Q.   Didn't you get a lot of very positive
feedback about the fliers you developed?
   A.   Yes, I did.
   Q.   Certainly from Canada, in any event, and
Chicago?
   A.   I believe so.
   Q.   So you weren't without things to do,
although some of these were things that you
developed yourself such as the idea for the
database, correct?
   A.   That is correct.
   Q.   You state that Mr. DiFeo was given a

Page 239

LORUSSO
yearly stipend of approximately $60,000 for his
apartment. How did you know that?
   A.   I don't remember. I don't recall.
   Q.   Are you aware that Mr. DiFeo is an
ex-patriot?
   A.   Yes.
   Q.   And you know that ex-patriot compensation
is very different from a local national
compensation?
   A.   Yes.
   Q.   Ex-patriots often get living allowance and
schooling allowances and taxes grossed up and all
that stuff. Are you aware of that?
   A.   Yes, I am.
   Q.   How do you know that Mr. DiFeo's salary
was $95,000?
   A.   I don't recall.
   Q.   Do you know for a fact that it is or
you're not really sure?
        MS. KURZON: Objection.
   Q.   Do you know for a fact that his salary was
$95,000?
   A.   No. I don't know for a fact.
   Q.   Did you ever discuss Mr. DiFeo's

Page 240

LORUSSO
compensation with Mr. Gallo?
   A.   No. I did not.
   Q.   Let's take a look at page 6, the second
full paragraph. This deals with Mr. Mariotti. Mr.
Mariotti had been pricing director, it says, and
then in May he became director sales and marketing
coordination, Passenger Division, and he got the
customer relations department.
        So at this point in time Mr. Mariotti had
pricing, he had customer relations. He also had
sales coordination and the alliance, didn't he?
   A.   I don't recall. I do remember him having
pricing and customer relations.
   Q.   How about sales coordination?
   A.   I don't recall.
   Q.   His title is director sales and marketing
coordination, Passenger Division?
   A.   Right.
   Q.   Did he ever tell you that he had — what
his responsibilities were?
   A.   I knew his responsibilities as pricing
director and marketing. I wasn't quite clear on the
sales coordination part.
   Q.   Marketing coordination, correct?

Page 241

LORUSSO
   A.   Right.
   Q.   In Passenger?
   A.   Right.
   Q.   You weren't really interacting with him in
business because you were in Cargo and there was no
real need to interact with Mr. Mariotti except on a
friendly level; is that correct?
   A.   That's correct.
   Q.   Are you aware that Lucia Alla now is
responsible for pricing?
   A.   Yes.
   Q.   And that she is responsible for sales
coordination?
   A.   If that's her title, then yes.
   Q.   I'm not representing what her title is.
   A.   Okay.
   Q.   Also, she is responsible for customer
relations, correct?
   A.   I am aware that she took Gabriele
Mariotti's position.
   Q.   Okay. And you didn't hear anything to
suggest that she didn't get all of it. She is doing
basically what Mariotti was doing?
   A.   Correct.

61 (Pages 238 to 241)

Page 206

1              LORUSSO
2    Q. Twenty-eight states, "In or around the
3    summer of 2005, Mr. Libutti announced that the
4    company intended to rejuvenate the New York office
5    and get rid of the 'old faces.'"
6        You say "announced." Was this at a
7    meeting?
8    A. I don't recall.
9    Q. Was this the statement that Mr. Mariotti
10   reported to you or are you thinking of something
11   specific? Something else, I mean.
12   A. I believe it was the statement that
13   Mariotti reported to me.
14   Q. So you never heard Libutti say this?
15   A. No.
16   Q. Paragraph 30 states that in October of
17   2005 you again complained of age and gender
18   discrimination.
19       To whom did you make that complaint?
20   A. I don't recall.
21   Q. Do you recall whether it was in writing?
22   A. I think I did put it in writing.
23   Q. All right. I haven't seen — I'll just
24   represent to you I have not seen anything in writing
25   between 2004 and, let's say, 2006. I haven't seen

Page 207

1              LORUSSO
2    an October 2005 complaint.
3        I just wonder, do you remember whether it
4    was in writing?
5    A. No. I don't remember.
6        I believe that October 2005 was when I was
7    told that GA2000 was closing, therefore I, most
8    probably, said at that time to Libutti and Gallo
9    that this was done on purpose.
10   Q. You don't have a specific recollection of
11   saying that to Libutti and Gallo?
12   A. Yes. I did say it to them.
13   Q. You have a specific recollection?
14   A. I have a specific recollection.
15   Q. Can you remember where that was said?
16   A. It must have been in Libutti's office. I
17   am not certain.
18   Q. You don't recollect that?
19   A. I don't recollect that.
20   Q. But you recollect saying it?
21   A. Yes.
22   Q. Do you recollect what reaction you got
23   from either one of them?
24   A. No. I don't recollect.
25   Q. You don't recall if either of them said

Page 208

1              LORUSSO
2    anything, or, if so, what they said?
3    A. Right.
4    Q. Now, when GA2000 was closed, what happened
5    to the employees of GA2000?
6    A. We let them go.
7    Q. They were all terminated?
8    A. They were all terminated.
9    Q. What kind of severance did they get?
10   A. Two weeks' salary.
11   Q. Two weeks' salary, period?
12   A. Yes.
13   Q. And the only exceptions to that were
14   yourself, who was kept on, although you may not have
15   had responsibilities to perform, and Mr. Farrow who
16   took early retirement?
17   A. Right. And the two of us were employed by
18   Alitalia and all the employees that were terminated
19   were employed by GA2000.
20   Q. Those employees were quite young, weren't
21   they, for the most part?
22   A. The GA2000 employees?
23   Q. Yes.
24   A. It was mixed.
25   Q. Mixed?

Page 209

1              LORUSSO
2    A. I think so.
3    Q. They weren't mostly young, relatively
4    low-paid employees?
5    A. They were low-paid employees and most of
6    them were hired through a temp agency.
7    Q. You didn't do the hiring. They were in
8    place when you got there, correct?
9    A. Most of them, yes.
10   Q. Who was your predecessor as general
11   manager of GA2000?
12   A. Jean-Paul.
13   Q. Say it again.
14   A. Jean-Paul. I don't know how to spell his
15   last name.
16   Q. J-E-A-N; hyphen, P-A-U-L?
17   A. Correct.
18   Q. French name?
19   A. Yes, or Belgian, I believe he was.
20   Q. Can you pronounce his last name?
21   A. Steurve, S-T-E-U-R-V-E. Something like
22   that.
23   Q. He was general manager of GA2000 before
24   you took over?
25   A. I don't know if that was his exact title,

53 (Pages 206 to 209)

One Penn Plaza, NYC                Toby Feldman, Inc.                     tel (212) 244.3990
email@tobyfeldman.com      NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS    tel (800) 246.4950